JOLAR CINEMA, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Jolar Cinema, Inc. v. Commissioner
Docket Nos. 15904-79, 15990-79, 1658-80, 1659-80, 9856-80, 9858-80, 9859-80, 9860-80, 9861-80, 9862,80, 9863-80, 9864-80, 9865-80, 9952-80, 9953-80, 9954-80, 9955-80, 9956-80, 9957-80, 9958-80, 9959-80, 9960-80, 9961-80, 14159-80, 16532-80, 17427-80, 17908-80, 22730-80, 6634-81, 6777-81, 6875-81, 9238-81, 9932-81, 9933-81, 11202-81, 11336-81.
United States Tax Court
T.C. Memo 1983-403; 1983 Tax Ct. Memo LEXIS 385; 46 T.C.M. (CCH) 721; T.C.M. (RIA) 83403; July 13, 1983. *385 Petitioner was president of 26 adult theater corporations and, as such, had signatory authority over the checking accounts of each of the corporations. Petitioner was responsible for the acquisition of the films shown at the theaters. Accordingly, funds were transferred by the corporations to petitioner during the years in question. Held, the funds so transferred did not constitute income to petitioner since he received them in an agency capacity and did not improperly divert any portion of them to his personal use. Held further, the film expense deductions to which the corporations are entitled are determined. Held further, certain of the corporations are liable for the addition to tax pursuant to section 6653(a), I.R.C. 1954. Robert J. Chicoine, for the petitioners. Wayne R. Appleman, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Docket
Taxable year
Addition
to tax
No.
Petitioner
ended Dec. 31,
Deficiency
under sec.
6653(a)
15904-79
Jolar Cinema, Inc.
June 30, 1976 [2]
$8,938.44
$446.92
June 30, 1977
3,378.52
168.93
15990-79
Jolar Cinema, Inc.
June 30, 1976 [2]
5,772.09
288.60
June 30, 1977
3,370.21
168.51
1658-80
Theatrical Management
Ltd., Inc.
1976
2,394.00
119.70
1659-80
Jolar Cinema, Inc.
1976
3,301.18
165.06
9856-80
Valeri V. and
1976
105,880.00
5,294.00
Vesta Trambitas
1977
109,825.00
5,491.00
9858-80
Wesley Nashman
1976
2,456.70
1977
3,158.51
9859-80
William D. and
1976
2,111.00
Doris H. Cooley
1977
3,074.00
9860-80
Clifford E. Hall
1976
264.00
1977
67.00
9861-80
William D. Cooley, Jr.
1976
2,950.00
and Sharon O. Cooley
1977
3,499.00
9862-80
Nancy S. Hall
1976
306.00
1977
520.00
9863-80
Ervin D. Mackie
1976
230.17
9864-80
Thomas A. and
Karyl A. Trambitas
1976
110.00
9865-80
Howard W. and
1976
1,982.00
Lila Bryant
1977
2,961.00
9952-80
Bill R. and
Jean M. Ellsworth
1976
1,187.00
9953-80
Margaret E. Nashman
1976
103.08
9954-80
Henri G. and
1976
$ 695.00
Marjorie G. Trueba
1977
1,245.00
9955-80
Estate of Paul J.
Huggard, Deceased,
and Marion K. Huggard
1976
611.00
9956-80
Albert and
1976
952.00
Marilyn Romano
1977
1,221.00
9957-80
Joseph W. and
1976
165.00
Carol L. Burns
1977
268.00
9958-80
Kenneth R. and
1976
1,143.00
57.00
Darilyn C. Bies
1977
313.00
9959-80
Roy J. and
1976
86.00
Betty J. Mackie
1977
399.00
9960-80
John F. and
Carolyn L. Ebert
1976
1,157.00
115.00
9961-80
Nancy Romano
1974
74.00
1976
59.00
14159-80
Paul Bendel
1976
680.00
[3] 196.00
1977
920.00
116.00
16532-80
Fred P. Holton
1976
467.00
1977
627.00
17427-80
Ronald L. and
1976
174.84
Amy F. Laande
1977
368.00
17908-80
Marion K. Huggard
1977
891.00
22730-80
Jolar Cinema, Inc.
1977
2,475.01
123.75
6634-81
Dawn McDonough Ferber
1976
2,762.00
1977
1,846.00
6777-81
Werner F. and
1977
2,072.00
Louise M. Ferber
6875-81
Werner F. Ferber
1976
1,667.00
9238-81
Estate of Elizabeth L.
1974
450.00
Spalding, Deceased,
1976
433.00
Gordon Evans, Personal
Representative
9932-81
Jack and
1976
$480.00
Edith Trambitas
1977
651.00
9933-81
Estate of George
1976
4,781.00
Trambitas and
1977
4,211.00
Maxine Trambitas
11202-81
Ervin D. and
Ruth H. Mackie
1977
351.84
11336-81
Peter and
1976
2,891.91
Mary Ann Cardone
1977
1,388.64
*386 After concessions, the issues for decision are (1) whether amounts received during 1976 and 1977 by Valeri Trambitas from the 26 corporations involved in this case constitute income during those years to Mr. Trambitas or whether such amounts need not be included in income by virtue of Mr. Trambitas's alleged agency relationship with the corporation; (2) whether the film expenses deducted for the taxable years 1976 and 1977 by the various corporations involved herein should be reduced as determined by respondent; and (3) whether certain of the petitioners are liable for additions to tax pursuant to section 6653(a), I.R.C. 1954, for the taxable years in question. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Valeri V. and Vesta Trambitas resided in Seattle, Washington at the time of filing the petition herein.[4] *388 *389 They filed their returns for the taxable *387 years in question with the Internal Revenue Service Center, Ogden, Utah. [5] *390 *391 Vesta Trambitas is a petitioner solely by reason of having filed joint returns with Valeri V. Trambitas (hereinafter petitioner). This case involves 26 corporations which operated theaters in various cities throughout the United States. These cities included Phoenix, Arizona; Chattanooga, Tennessee; Orlando, Florida; New York, New York; Boston, Massachusetts; Baltimore, Maryland; Washington, D.C.; New Orleans, Louisiana; Youngstown, Ohio; Pittsburgh, Pennsylvania; Dallas, Texas; Fort Worth, Texas; Denver, Colorado; Louisville, Kentucky; Atlanta, Georgia; Jacksonville, Florida; Nashville, Tennessee; Memphis, Tennessee; Kansas City, Missouri; and Seattle, Washington. Of the 26 corporations, 21 were subchapter S corporations, and many of the petitioners were shareholders in such corporations. These corporations generally operated under the name Ellwest Stereo Theaters, Inc. (hereinafter Ellwest Theaters), although one was operated as Western Amusement Company (hereinafter Western Amusement). Five of the corporations were regular corporations operating under the name Jolar Cinema, Inc. (hereinafter Jolar Cinemas). The other corporation herein, Theatrical *392 Management Ltd., Inc. (hereinafter Theatrical Management) was located in Seattle, Washington.
Ellwest Theaters, Jolar Cinemas, and Western Amusement operated theaters which exhibited what has euphemistically been called adult films. The design of the theaters was essentially the same in each city. The movies were shown in individual booths with a sofa at one end and a screen at the other. Customers either obtained tokens from a cashier or dropped quarters into a coin box which activated a projector that played a 2- or 3-minute sequence from a movie. The film was 16 mm color film and the subject matter of the movies was sexually explicit. Petitioner owned stock in 13 of the 21 subchapter S corporations with an ownership interest in most cases of approximately 19 percent. [6] He was also president of each of the 26 theater corporations and, as such, had signatory authority over the checking accounts of each of the 26 corporations during the years in question. [7] *393 In 1974, each of the theater corporations entered into a management agreement with Theatrical Management. Petitioner was the president and sole stockholder of this corporation. The purpose of the agreement was to formalize the management relationship between the theaters and Theatrical Management. Prior to the execution of the agreement, Theatrical Management had functioned for the various corporations as a conduit through which monies were collected and expenses paid. The arrangement was carried out informally with no written agreement. An audit by the Washington State Department of Revenue raised the issue of whether receipts of the theaters running through the accounts of Theatrical Management were subject to state business and occupation tax. As a result of the audit, the corporations' lawyer and accountants decided to memorialize the arrangement in writing by executing the management agreement. Pursuant to the management agreement, Theatrical Management was to render management services to each of the corporations. Among other things, Theatrical Management was to "[b]e solely responsible for the selection *394 and exhibition of films in operation of the company's business." The agreement specifically provided that the responsibility for the payment of theater expenses would be that of each theater; however, Theatrical Management could actually pay any or all of the expenses of the theaters out of the theaters' funds. In addition, the theaters were to pay Theatrical Management a basic monthly fee of $500 and 5 percent of the annual net profits of each corporation. Petitioner, however, never required this fee to be paid. An amendment to the initial management agreement was adopted by the theater corporations after discussions at a shareholder meeting. Paragraph (m) was added to the agreement to provide that all of the monies of the various corporations would run through the account of Theatrical Management. In 1976 and 1977 all operational expenses of the theaters with the exception of film expenses were paid directly by the individual corporations. The film expenses were paid by the corporations by way of periodic transfer of funds to petitioner in one of the three following manners: corporate checks were endorsed by petitioner and cashed out; corporate checks were deposited to petitioner's *395 personal savings account with withdrawals in the same amount made on or about the same day in currency; or corporate checks were deposited to "business" checking accounts in petitioner's name at Chase Manhattan Bank in New York or Seattle First National Bank in Seattle. Petitioner personally arranged for the acquisition of the films exhibited at the various theaters. He used the funds received from the corporations to pay all film-related expenses incurred by him on their behalf. Such expenses included production costs, processing costs, distribution costs and other miscellaneous expenses. These expenses were paid in cash. Sometime in 1975, petitioner approached an accounting firm and disclosed his system of passing corporate funds through his own accounts in order to allow him to pay film-related expenses in cash. Petitioner and the theater corporations started using this method of payment after the United States Supreme Court issued its decision in Miller v. California,413 U.S. 15 (1973), which defined pornography in terms of local community standards. This rule created a great deal of uncertainty in a national operation like that of the 26 theater corporations involved herein. *396 Petitioner did not want to leave a "paper trail" that might subject those involved in the production and distribution process to criminal or civil liability. The accounting firm concluded that for financial and income tax reporting purposes, petitioner was acting as an agent on behalf of the theaters and the funds received from them were not income to him but property of the theaters until spent. Petitioner provided to the accountants information concerning the "film accounts," including check stubs, cancelled checks, and bank statements to enable them to summarize receipts and disbursements on a semi-annual basis.The difference between receipts deposited in the film accounts and disbursements from the accounts for film-related expenses was treated by the accountants as a prepaid expense of each corporation. [8]
On occasion, petitioner borrowed money from the film accounts for personal and corporate purposes. The loans were noted contemporaneously *397 on the checks stubs and subsequently disclosed to the accountants. The repayment of loans was also noted by petitioner on the check register. Loan disbursements were not deducted as film expenses. The records maintained by the accounting firm by no means reflect petitioner's disbursements with precision. Occasionally, as stated, petitioner cashed corporate checks and paid film expenses directly without passing the funds through his accounts. The schedule of the accountants did not reflect such cashouts. Additionally, many of the expenditures for film expenses were recorded from coded notations on petitioner's check stubs. During 1976 and 1977, petitioner received $429,800 and $313,500, respectively, from the 26 theater corporations for the purpose of paying film expenses.During these years, most of the films exhibited at the theaters were acquired from an independent film producer, with whom petitioner contracted for the production of 96 films per quarter. The producer charged $35,000 per quarter and was paid in cash. [9] He produced 96 films for each of the four quarters of 1976 and for three quarters of 1977. During the third quarter of 1977, he produced only 48 films for petitioner. *398 During that period, petitioner employed another person to produce the remainder of the series. The films were processed in one of two laboratories. During 1976 and the first quarter of 1977, the films were processed by a laboratory in New York. During the remainder of 1977, the films were processed at a laboratory in Seattle. As a general rule, the films were developed or processed on a quarterly basis. The laboratory made a master of each of the original films delivered by the producer and then, depending upon the order, made copies or prints for distribution to the various theaters. The laboratory in Seattle normally made an average of 23 copies of each master film. The Seattle laboratory charged between $30,000 and $35,000 per quarter (series), depending upon the total footage developed. *399 All payments were in cash and were made by petitioner to the general manager of the laboratory. The New York laboratory charged more for processing film than the Seattle laboratory. The fee generally ranged between $35,000 and $40,000 per quarter. The increasingly higher cost charged by the New York laboratory was a major reason why petitioner changed laboratories in 1977. The films were distributed by way of couriers, who hand-delivered them to the theaters every 12 weeks. The couriers were not employees of the theater corporations, but were independent contractors hired by petitioner on their behalf. Each theater introduced approximately four new films per week throughout the year. For their services, petitioner made lump-sum cash payments to each of the couriers. On his returns for the years in question, petitioner did not include in income any of the amounts received from the theater corporations and did not deduct any expenses paid with the money received from such corporations. In his statutory notice, respondent determined that petitioner received $449,300 in income during 1976 from the corporations and $318,500 during 1977.Respondent also determined that film expenses *400 were incurred in the amount of $304,707 during 1976 and $173,500 during 1977. With respect to the $304,707 allowed as expenses in 1976, respondent determined that $135,930 was expended for the production of film and $168,777 was expended for laboratory fees. No amount was allowed by respondent for distribution or other miscellaneous expenses relating to film. For the calendar year 1977, respondent determined that a total of $173,500 was expended for producer and film processing costs.No costs were allowed for distribution or miscellaneous expenses. Respondent reduced the film expense deduction for each of the subchapter S corporations involved herein by applying a ratio of allowable producer and film processing costs ($304,707 for 1976 and $173,500 for 1977) over film receipts received by petitioner from the corporations to the film expenses deducted by each corporation on its corporate tax return for its respective taxable years ending in 1976 and 1977. Respondent disallowed all film expenses to Theatrical Management and the Jolar Cinema Theaters. OPINION The primary issue in this case is whether petitioner must include amounts received from the 26 corporations in his income for *401 1976 and 1977. If so, we must decide the amount of film expenses that are properly deductible from petitioner's income for those years. If not, we must decide the amount of film expenses that are properly deductible by the theater corporations. The issue of whether the amounts received by petitioner are includable in his income depends upon the capacity in which he received them. See Heminway v. Commissioner,44 T.C. 96, 100 (1965). If they were received under a claim of right, without restriction as to their disposition, they must be included in petitioner's gross income. North American Oil Consolidated v. Burnet,286 U.S. 417, 420 (1932). If, on the other hand, petitioner received the funds only as an agent of the corporations for the purpose of procuring films, then the amounts so received do not constitute income to him, Lashell's Estate v. Commissioner,208 F.2d 430, 435 (6th Cir. 1953), [10] except to the extent, if any, such funds were improperly diverted to his personal use.[11]
We are convinced that petitioner received the monies paid over to him by the corporations *402 only as an agent of the corporations and that he considered his use of such monies to be restricted by his agency status. The funds were transferred to petitioner for the express purpose of acquiring films on behalf of the corporations, and even respondent concedes that a substantial portion of such funds were so used. The excess of the amount of funds transferred to petitioner over the amount reportedly used by him to procure films was treated as a prepaid expense of the corporations both for financial and Federal income tax reporting purposes with the full expectation that petitioner would use such excess to acquire films in the future. We are amply satisfied that all interested parties regarded petitioner as a buying agent. Given this, we next must decide whether petitioner improperly diverted any portion of the amounts received by him from the corporations. We conclude that he did not. It is true that petitioner kept poor records of his expenditures on behalf of the corporations. However, it does not automatically follow from this that petitioner wrongfully diverted or embezzled funds from the corporations. There is no evidence whatsoever that petitioner used any of the *403 corporate funds for his own benefit. Consequently we will not impute dishonest conduct. At most, petitioner is unable to substantiate the deductibility by the corporations of expenses he paid, as an agent, on their behalf. Our finding that petitioner held all amounts received as an agent for the corporations and that he did not divert any of such funds to his own use means that he is not taxable on any amounts received from the corporations during 1976 and 1977. However, the payment by the corporations of money to petitioner for the purpose of producing and processing films to be used by those corporations does not relieve them of their obligation to substantiate deductions. The intervention of an agent does not sever the corporations from their individual duty to account for specific deductible expenditures. In effect, the arrangement can be viewed as if the three accounts to which the monies of the corporations were deposited were actually corporate accounts. The fact that a corporation deposits money in a checking or savings account from which it intends to pay deductible expenses does not mean that all amounts so deposited are deductible in the year of deposit. Only those *404 amounts that are paid from the accounts for deductible expenditures can be deducted. Thus, it is our task to determine the amount of expenditures paid by petitioner on the corporations' behalf that is deductible. That the petitioners engaged in a business which could not be operated in full sunshine, with the consequent need to deal extensively in cash, is obviously not a problem of respondent's making. Petitioner claims that the corporations are entitled to deductions for the following expenditures for the years in question: 1976
1977
Film production
$160,930
$140,000
Laboratory expenses
168,777
130,000
Distribution expenses
50,000
50,000
Miscellaneous expenses
18,845
19,825
Prepaid film expenses
2,659
$401,211
$339,825
Respondent allowed deductions for film production expenses of $135,930 and laboratory expenses of $168,777 for 1976 and a composite deduction for both expense categories of $173,500 for 1977. We find, based in part on the credible testimony of petitioner and the producer, that petitioner paid $140,000 in 1976 and $122,500 in 1977 for the production of films. The parties are apparently in agreement that petitioner paid $168,777 in 1976 on behalf of the corporations for the processing *405 of films (laboratory expenses), and we hold that petitioner paid a similar expense of $120,000 in 1977. Respondent allowed no deductions for distribution expenses for either 1976 or 1977. The evidence is quite clear that petitioner had films delivered to each of the 26 corporations during the years at issue. The films were hand-delivered by couriers hired by petitioner who traveled to each location at least four times a year. This no doubt involved a great deal of travel and therefore substantial expenditures. In view of this, we find that petitioner paid $25,000 during each of the 2 years in question for delivery of the films to the various theater corporations. Accordingly, this amount is deductible by the corporations. [12] *406 Petitioner also claimed miscellaneous expenses with respect to the acquisition of films of $18,845 in 1976 and $19,825 in 1977. We do not believe that these amounts were adequately substantiated and therefore hold that they are not deductible in excess of any amounts conceded by respondent on brief.Moreover, we hold that the "prepaid film expense" is not deductible by the corporations since it was not "paid" to anyone other than an agent of the corporations. Such a transfer does not give rise to a deductible expense. The amounts determined to be deductible are to be allocated pro rata to the corporations based upon their percentage of individual payments to petitioner over the total amount paid to petitioner by all 26 corporations. In his statutory notices, respondent determined additions to tax with respect to five corporations and a number of individual shareholders of subchapter S corporations. [13] Respondent has expressly conceded the additions with respect to the individual taxpayers. With respect to the corporations, we hold *407 that they are liable for the section 6653(a), I.R.C. 1954, addition since they failed to maintain adequate books and records substantiating the deductions they claimed. See Estate of Harrison v. Commissioner,62 T.C. 524, 535 (1974). [14]
To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Jolar Cinema, Inc., Docket No. 15990-79; Theatrical Management Ltd., Inc., docket No. 1658-80; Jolar Cinema, Inc., docket No. 1659-80; Valeri V. and Vesta Trambitas, docket No. 9856-80; Wesley Nashman, docket No. 9858-80; William D. and Doris H. Cooley, docket No. 9859-80; Clifford E. Hall, docket No. 9860-80; William D. Cooley, Jr. and Sharon O. Cooley, docket No. 9861-80; Nancy S. Hall, docket No. 9862-80; Ervin D. Mackie, docket No. 9863-80; Thomas A. and Karyl A. Trambitas, docket No. 9864-80; Howard W. and Lila Bryant, docket No. 9865-80; Bill R. and Jean M. Ellsworth, docket No. 9952-80; Margaret E. Nashman, docket No. 9953-80; Henri G. and Marjorie G. Trueba, docket No. 9954-80; Estate of Paul J. Huggard, Deceased, and Marion K. Huggard, docket No. 9955-80; Albert and Marilyn Romano, docket No. 9956-80; Joseph W. and Carol L. Burns, docket No. 9957-80; Kenneth R. and Darilyn C. Bies, docket No. 9958-80; Roy J. and Betty J. Mackie, docket No. 9959-80; John F. and Carolyn L. Ebert, docket No. 9960-80; Nancy Romano, docket No. 9961-80; Paul Bendel, docket No. 14159-80; Fred P. Holton, docket No. 16532-80; Ronald L. and Amy F. Laande, docket No. 17427-80; Marion K. Huggard, docket No. 17908-80; Jolar Cinema, Inc., docket No. 22730-80; Dawn McDonough Ferber, docket No. 6634-81; Werner F. and Louise M. Ferber, docket No. 6777-81; Werner F. Ferber, docket No. 6875-81; Estate of Elizabeth L. Spalding, Deceased, Gordon Evans, Personal Representative, docket No. 9238-81; Jack and Edith Trambitas, docket No. 9932-81; Estate of George Trambitas and Maxine Trambitas, docket No. 9933-81; Ervin D. and Ruth H. Mackie, docket No. 11202-81; and Peter and Mary Ann Cardone, docket No. 11336-81.↩
2. The taxable year for these petitioners ended June 30 rather than Dec. 31. ↩
3. Respondent also determined an addition to tax under sec. 6651(a) of $170 and $230 for the years 1976 and 1977, respectively.↩
4. The other petitioners in this case resided or maintained their principal place of business in the following places at the time of filing their petitions: Jolar Cinema, Inc., docket No. 15904-79, Boston, Mass.; Jolar Cinema, Inc., docket No. 15990-79, Nashville, Tenn.; Theatrical Management Ltd., Inc., docket No. 1658-80, Seattle, Wash.; Jolar Cinema, Inc., docket No. 1659-80, New York, N.Y.; Wesley Nashman, docket No. 9858-80, Bellevue, Wash.; William D. and Doris H. Cooley, docket No. 9859-80, Bothell, Wash.; Clifford E. Hall, docket No. 9860-80, Bothell, Wash.; William D. Cooley, Jr. and Sharon O. Cooley, docket No. 9861-80, Edmonds, Wash.; Nancy S. Hall, docket No. 9862-80, Redmond, Wash.; Ervin D. Mackie, docket No. 9863-80, Gretna, La.; Thomas A. and Karyl A. Trambitas, docket No. 9864-80, Portland, Ore.; Howard W. and Lila Bryant, docket No. 9865-80, Hoquiam, Wash.; Bill R. and Jean M. Ellsworth, docket No. 9952-80, Seattle, Wash.; Margaret E. Nashman, docket No. 9953-80, Palm Springs, Calif.; Henri G. and Marjorie G. Trueba, docket No. 9954-80, Seattle, Wash.; Estate of Paul J. Huggard, Deceased and Marion K. Huggard, docket No. 9955-80, Seattle, Wash.; Albert and Marilyn Romano, docket No. 9956-80, Seattle, Wash.; Joseph W. and Carol L. Burns, docket No. 9957-80, Seattle, Wash.; Kenneth R. and Darilyn C. Bies, docket No. 9958-80, Bothell, Wash.; Roy J. and Betty J. Mackie, docket No. 9959-80, Kent, Wash.; John F. and Carolyn L. Ebert, docket No. 9960-80, San Diego, Calif.; Nancy Romano, docket No. 9961-80, Seattle, Wash.; Paul Bendel, docket No. 14159-80, Edmonds, Wash.; Fred P. Holton, docket No. 16532-80, New Orleans, La.; Ronald L. and Amy F. Laande, docket No. 17427-80, Tigard, Ore.; Marion K. Huggard, docket No. 17908-80, Seattle, Wash.; Jolar Cinema, Inc., docket No. 22730-80, Charlotte, N.C.; Dawn McDonough Ferber, docket No. 6634-81, Seattle, Wash.; Werner F. and Louise M. Ferber, docket No. 6777-81, Bothell, Wash.; Werner F. Ferber, docket No. 6875-81, Bothell, Wash.; Estate of Elizabeth L. Spaulding, Deceased, Gordon Evans, Personal Representative, docket No. 9238-81, Auke Bay, Alaska; Jack and Edith Trambitas, docket No. 9932-81, Auke Bay, Alaska; Estate of George Trambitas and Maxine Trambitas, docket No. 9933-81, Copalis Beach, Wash.; Ervin D. and Ruth H. Mackie, docket No. 11202-81, Ravensdale, Wash.; and Peter and Mary Ann Cardone, docket No. 11336-81, Wantagh, N.Y. 5. The other petitioners in this case filed their returns for the taxable years in question with the Internal Revenue Service Center in the following cities: Jolar Cinema, Inc., docket No. 15904-79, Andover, Mass.; Jolar Cinema, Inc., docket No. 15990-79, Holtsville, N.Y.; Theatrical Management Ltd., Inc., docket No. 1658-80, Ogden, Utah; Jolar Cinema, Inc., docket No. 1659-80, Holtsville, N.Y.; Wesley Nashman, docket No. 9856-80, Ogden, Utah; William D. and Doris H. Cooley, docket No. 9859-80, Ogden, Utah; Clifford E. Hall, docket No. 9860-80, Ogden, Utah; William D. Cooley, Jr. and Sharon O. Cooley, docket No. 9861-80, Ogden, Utah; Nancy S. Hall, docket No. 9862-80, Ogden, Utah; Ervin D. Mackie, docket No. 9863-80, Austin, Texas; Thomas A. and Karyl A. Trambitas, docket No. 9864-80, Ogden, Utah; Howard W. and Lila Bryant, docket No. 9865-80, Ogden, Utah; Bill R. and Jean M. Ellsworth, docket No. 9952-80, Ogden, Utah; Margaret E. Nashman, docket No. 9953-80, Fresno, Calif.; Henri G. and Marjorie G. Trueba, docket No. 9954-80, Ogden, Utah; Estate of Paul J. Huggard, Deceased, and Marion K. Huggard, docket No. 9955-80, Ogden, Utah; Albert and Marilyn Romano, docket No. 9956-80, Ogden, Utah; Joseph W. and Carol L. Burns, docket No. 9957-80, Ogden, Utah; Kenneth R. and Darilyn C. Bies, docket No. 9958-80, Ogden, Utah; Roy J. and Betty J. Mackie, docket No. 9959-80, Ogden, Utah; John F. and Carolyn L. Ebert, docket No. 9960-80, Fresno, Calif.; Nancy Romano, docket No. 9961-80, Ogden, Utah; Paul Bendel, docket No. 14159-80, Ogden, Utah; Fred P. Holton, docket No. 16532-80, Austin, Texas; Ronald L. and Amy F. Laande; docket No. 17427-80, Ogden, Utah; Marion K. Huggard, docket No. 17908-80, Ogden, Utah; Jolar Cinema, Inc., docket No. 22730-80, Memphis, Tenn.; Dawn McDonough Ferber, docket No. 6634-81, Ogden, Utah; Werner F. and Louise M. Ferber, docket No. 6777-81, Ogden, Utah; Werner F. Ferber, docket No. 6875-81, Ogden, Utah; Estate of Elizabeth L. Spaulding, Deceased, Gordon Evans, Personal Representative, docket No. 9238-81, Ogden, Utah; Jack and Edith Trambitas, docket No. 9932-81, Ogden, Utah; Estate of George Trambitas and Maxine Trambitas, docket No. 9933-81, Ogden, Utah; Ervin D. and Ruth H. Mackie, docket No. 11202-81, Ogden, Utah; and Peter and Mary Ann Cardone, docket No. 11336-81, Holtsville, N.Y.
6. Various relatives of petitioner also owned stock in the subchapter S corporations. ↩
7. As president of the 21 subchapter S corporations, petitioner received compensation from 20 of the 21 corporations in 1976 and 19 of the 21 corporations in 1977 in the amounts of $600 or $900 from each corporation.
8. This excess was allocated to each corporation on the basis of its pro rata share of the total amounts paid to petitioner and was reflected on the respective annual financial statements and Federal income tax returns of each corporation.↩
9. All production expenses incurred by the producer were paid by him out of money received from petitioner. The producer contacted an agent who arranged for actors and set up shooting days. The producer then rented studio lights, cameras, and other set requirements, shot the film and edited it. After the film was edited, he delivered the negatives to one of two laboratories which processed the film.↩
10. See also Shaara v. Commissioner,T.C. Memo. 1980-247↩. 11. See, e.g., Nuckols v. Commissioner,T.C. Memo. 1970-308↩.
12. Respondent contends that the distribution expense must be substantiated in compliance with sec. 274(d), I.R.C. 1954, in order to be deductible. Sec. 274(d) is not applicable here. The payments by petitioner to the couriers, who were independent contractors, were not payments for travel but rather were payments for services rendered. Although the couriers themselves might have to satisfy sec. 274(d) with respect to the deduction of expenses they incurred for travel away from home, there is no additional requirement that the corporations must meet the strict substantiation requirements of sec. 274(d)↩.
13. Our determination of no deficiency with respect to petitioner disposes of the addition with respect to him. ↩
14. No argument was made by petitioner in docket No. 14159-80 with respect to the sec. 6651(a) additions to tax and therefore, assuming it has not been conceded, they have failed to carry their burden of proof on this issue.↩