RONALD I. PETERSEN AND GLORIA M. PETERSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent
Petersen v. Commissioner
Docket No. 30455-83.
United States Tax Court
T.C. Memo 1987-108; 1987 Tax Ct. Memo LEXIS 104; 53 T.C.M. (CCH) 235; T.C.M. (RIA) 87108; February 24, 1987. Robert Chicoine and Darrell D. Hallett, for the petitioners. Hugh Spall, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency in and an addition to petitioners' Federal income tax for the year 1979 as follows: Addition to Tax
Deficiency
Sec. 6653(a)
$9,821.00
$491.00 [1]
Respondent, in his answer, seeks damages pursuant to section 6673. The issue for decision is whether petitioners are entitled to deduct as charitable contributions pursuant to section 170 certain *106 payments made to the Venusian Church. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated herein by this reference. At the time the petition herein was filed petitioners maintained a legal residence within the state of Washington. Petitioner Ronald I. Petersen ("Petersen") made six payments in the aggregate sum of $15,000.00 during the year in issue to the Venusian Church. Each transfer was from funds on deposit with the Pacific National Bank of Washington in the sole account name of Petersen. Petersen testified that additional payments in the aggregate sum of $3,239.00 were made to the Venusian Church during November and December of 1979 from an account other than the Pacific National Bank of Washington account. The record is devoid of other means of substantiation regarding the transfers in November and December of 1979. Petitioners deducted the amount of $18,339.00 designated as a charitable contribution to the Venusian *107 Church on their 1979 Federal income tax return. The Venusian Church was formed in July of 1976. Petitioners and William Cooley ("Cooley") were designated as directors and ordained ministers of the entity. The Venusian Church was incorporated in the state of California in the year 1977. The State of California suspended the corporate powers, rights and privileges of the Venusian Church on March 1, 1979 pursuant to the provisions of the California Bank and Corporation Tax Law. The Venusian Church also obtained a Universal Life Church charter on July 1, 1976. Petersen stated that his view at the time was that the Venusian Church would qualify for tax exempt status under the perceived umbrella tax exemption of the Universal Life Church. The Universal Life Church charter was posted at the Temple of Venus. In August of 1977, the Venusian Church made application to the Internal Revenue Service for recognition of exemption under section 501(c)(3). The Internal Revenue Service denied such application and at no time was the Venusian Church granted tax exempt status. The Venusian Church did not draft articles of incorporation or other governing instrument to establish guidelines concerning *108 policies, activities or beliefs. Petersen stated that policies were established pursuant to egalitarian guidelines such that "* * * we were governed by the members. The members were the people that actually sourced events. They were the ones that would set policies. They were the ones that would determine what kind of events they wanted to have and where they would have them and each and every facet that went on in the church was sourced by the members. * * *" During the year in issue, Petersen stated that approximately one hundred individuals had a "formal relationship" with the Venusian Church and that approximately fifteen hundred people were listed on a mailing list as occasional participants. The record provides no reliable evidence as to the intended distribution of Venusian Church assets upon any dissolution. In 1977, Petersen owned a one-half interest in Delvesco, Inc. ("Delvesco") which owned property on which a massage parlor doing business as Yvette's Massage and Sauna ("Yvette's) was operated. In June of 1977, Petersen agreed to sell his entire interest in Delvesco and Yvette's for $25,000.00 to Joe Brown, the other stockholder of Delvesco. Instead, Petersen *109 donated his interest in Delvesco and Yvette's to the Venusian Church and valued such donation in the amount of $25,000.00 for deduction purposes on petitioners' 1977 Federal income tax return. [2]
Petersen was a minority shareholder in eight Ellwest Stereo Corporations ("Ellwest Theatres") and received dividend income from such source. Ellwest Theatres exhibited so-called adult films in various cities throughout the United States. The design of the Ellwest Theatres was essentially the same in each city such that customers viewed movies in individual booths containing coin boxes which activated a projector to exhibit approximately a three minute sequence of a film. The films were sexually explicit. [3]
Petersen and Cooley were trustees of Interfaith Foundation. Petersen and Cooley owned in excess of fifty percent (50%) of the stock of *110 Uniview Corporation ("Uniview"). Cooley and the other stockholders of Uniview were also stockholders of Ellwest Theatres. One of the initial activities of the Venusian Church was to establish the Temple of Venus ("Temple") at 1414 First Avenue in Seattle, Washington within an area sometimes referred to as an adult entertainment district. Uniview owned and operated a business known as the Amusement Center located at 1416 First Avenue immediately adjacent to the Temple. The premises of the Amusement Center was leased by Interfaith Foundation. Interfaith Foundation held the panorama license for the Amusement Center. A panoram license is a business license issued by the city of Seattle to establishments which exhibit coin operated films. Uniview previously held the panoram license for the Amusement Center. Interfaith Foundation claimed to be exempt from all applicable city of Seattle fees on the basis that Interfaith Foundation was a non-profit religious foundation. The Temple included approximately forty-eight exhibits including lithographs, films, brochures, recorded messages, and a form of live exhibit. According to Petersen each exhibit was intended to further the philosophies *111 and values of the Venusian Church. The Temple contained as one type of exhibit individual movie booths containing coin operated movie projectors exhibiting sexually graphic film similar to those at Ellwest Theatres. The Temple also included a series of individual booths arranged in a horseshoe shaped configuration for purposes of viewing a live performance. Each booth contained a coin operated "donation box" which upon the deposit of a silver dollar raised a window shade or curtain revealing the live performance for a period of three minutes. Individual performers were auditioned for the cast. Membership in the Venusian Church was not a mandatory requirement to become a performer. The Venusian Church paid the performers wages of approximately $5.00 per hour. The live performances exhibited various sexual acts including heterosexual, bisexual and homosexual acts. On occasion, the performances included three members of the cast. The Temple also offered sexually explicit individual performances in which a woman would also engage in a discussion of the sexual fantasies or the frustrations of patrons within the group. The fee for individual performance was $10.00. Sharon Cain *112 was a performer in the individual performance and was paid compensation comparable to the other performers. Sharon Cain was also paid a "poverty assistance" stipend by the Venusian Church in the amount of $10,200.00. Patrons of the Temple were generally expected to pay for the right to view the films or the live performances. There were no signs in the Temple to indicate that patrons could view such exhibits at no cost. On occasion, certain groups such as academic or journalistic interests were provided access to the Temple's exhibits at no cost. During the year 1979, several performers at the Temple were arrested and charged with lewd conduct related to the live performances pursuant to Seattle Criminal Code section 12A.10.070 ("lewd conduct ordinance") and Seattle Criminal Code section 12A.10.080 ("body studio ordinance"). Trials were held in the year 1980 which resulted in several convictions pursuant to the lewd conduct ordinance and the body studio ordinance. The defendants were fined and received deferred jail sentences. The lewd conduct ordinance and body studio ordinance convictions were appealed to the Washington State Supreme Court regarding First Amendment issues. *113 The Washington State Supreme Court affirmed the convictions determined by the trial court. Curtis v. Seattle,97 Wash. 2d. 59, 639 P. 2d 1370 (1982). The Venusian Church paid the legal costs incurred by the individuals concerned. During the year 1977, the Venusian Church located an abandoned retreat camp referred to as Camp Armac ("Armac"). The Venusian Church leased Armac for a period of approximately two years and six months. Armac was situated on the thirty two acres of land in Bothell, Washington. The facilities at Armac included dormitories, cafeteria, three houses, a pool, a hot tub, and a large seminar building. Patrons of the Temple received leaflets and viewed a film depicting the activities at Armac. Fees were charged by the Venusian Church to patrons participating at Armac. The membership fee was $250.00. Fees at Armac were on occasion lower than $250.00 for members of the Venusian Church. Children were permitted at Armac. However, children were prohibited from certain designated areas and activities. The Venusian Church leaflet described the Armac retreat as follows: ARMAC IS A private religious retreat where people experience ways of *114 being together in an atmosphere that permits pleasure, creativity and expression of fantasy. We actively support efforts to expand our spiritual potential as human beings. Our goal is processing human growth. A serene setting where the worth and dignity of our humanness can be experienced. The wearing of clothing is always optional and openness and honesty is encouraged. RELAX A very important part of spiritual rejuvenation is relaxation and recreation. Once relaxed, you become more openly receptive to the sensual, very human feelings that surround you at Armac. Space is provided for relaxation in a peaceful meadow, allowing the sun's rays to completely envelope your body - you may opt to sunbathe in the nude as all areas of Armac are clothing optional. Other relaxation areas include the hot spa and sauna. Recreational activities include volleyball, badminton, ping-pong, swimming in our 40' by 40' swimming pool, or you may simply choose to stroll along our meandering stream, or join any of the several group discussions which seem to be taking place just about everywhere on the grounds. Private rooms are available for those quiet moments when individuals or groups *115 wish to just "get away" for meditation or just to be alone. Parties and dances are scheduled from time to time to round out our complete recreational program. EXPLORE At Armac, opportunity to explore alternative life-styles and spiritual thought processes is a central focus. We believe in human growth. In order to facilitate this growth, workshops, and seminars are scheduled continuously in many areas of interest. From massage to meditation, from group inter-action to personal introspection, participants at Armac are encouraged to explore their options and expand their horizons. The programs at Armac are both practical and experiential and afford everyone the opportunity to release their human potential. You will not only explore yourself in these programs, but exploration of others is encouraged in a non-threatening way, so that the feelings of caring and loving can be shared by all who participate. DISCOVER You will discover your God-Self at Armac. It is a place to discover oneself as well as others. When you learn to appreciate yourself, you can truly appreciate and love your fellow human beings. Growth and feelings of love co-exist beautifully in an atmosphere *116 of pleasing sensitivity. You will begin to be aware of your fantastic potential as a human being from your very first week-end or mid-week respite at Armac. From there, you will discover the unity of your spriritual and sensual self. Petitioners resided at Armac for approximately six months during the year in issue until such time as the lease at Armac was terminated. Petitioners paid no expenses to the Venusian Church regarding their residency at Armac. Upon the termination of the lease at Armac, petitioners moved to an apartment in Issaquah, Washington. The Venusian Church paid some part of petitioners' rent on the Issaquah apartment by checks dated November 5, 1979 and December 3, 1979 in the respective amounts of $280.00 and $315.00. Petersen signed each check as signatory authority for Venusian Church. The Venusian Church on occasion paid for petitioners' personal telephone service. The Venusian Church attempted to locate a facility to replace Armac during the period of approximately June of 1979 until sometime in the year 1981. During this interim period the activities of Armac were conducted at petitioners' apartment, other member's homes, rental spaces, and at *117 a weekend retreat facility. During the year 1981, the Venusian Church located a replacement facility known as "Longhouse." The Venusian Church printed a leaflet titled "How to Win at the Longhouse" which delineated "the Venusian and Longhouse ethics." The Longhouse remained in operation as of the date of trial. The Venusian Church maintained books and records on a fiscal year end of July 31st. During the fiscal year end July 31, 1980, the books reflect machine contributions from the "donation boxes" at the Temple in the amount of $95,711.47 and other contributions in the amount of $29,752.97. The records of the Venusian Church for fiscal year end July 31, 1980 show a net operating loss in the amount of $5,161.49. The expenses shown within such records include but are not limited to the following: Family assistance
$10,000.00
Legal and Accounting
7,954.25
Legal Bail Expense
1,881.00
Poverty Assistance
10,200.00
Wages
54,071.08
Parsonage Allowance
5,203.08
Jay Gearon ("Gearon") received the parsonage allowance. Gearon managed the operations at the Temple. Sharon Cain ("Cain") received the Poverty Assistance. Cain performed in the live performance *118 at the Temple. Rae Larson ("Larson") received a bachelor's degree in psychology from Stanford University in the year 1963 and a masters degree from Washington State in psychology in the year 1967. Larson has attended special workshops and training at the National Sex Forum in San Francisco, California, a forum to educate human sexuality counselors. Larson has served as a counselor and director of the Seattle Counseling Service for Sexual Minorities, a counseling service for sexual minorities such as homosexuals, transsexuals, and transvestites. Larson has been in private practice for fifteen years and served as co-director to the Seattle Institute for Sex Therapy, an institution co-founded by Larson in the year 1975. Larson became a member of the Venusian Church in the year 1977. Larson was active in the establishment of the live exhibit at Temple and participated as a performer in the live performance at the Temple. One project designed by Larson for the Temple was the "Birth of Venus", a nude ballet to the musical score of Daphne and Cloe. Larson also designed workshops and participated at Armac. James Zacharias ("Zacharias") became affiliated with the Venusian Church *119 in the year 1977. Zacharias received a bachelor's degree from Hiram College and received a graduate divinity degree at Oberlin College. Zacharias became an ordained minister in the Venusian Church. Zacharias conducted sexuality workshops at Armac designed to enhance "personal growth and personal awareness of the membership." Zacharias received fees for his services regarding the workshops at Armac. Jay Gordon Melton ("Melton") is the director of the Institute for the Study of American Religion in Evanston, Illinois. Melton received a master of divinity degree from Garrett Theological Seminary in Illinois and a doctorate in history and literature of religions from Northwestern University. Melton is an American religion and social historian with a specialty in minority religious traditions. Melton has authored the "Directory of Religious Bodies in the United States." Melton defined neopaganism as a movement of goddess worship started during the 1950's in England, by Gerald Gardner who also operated a commercial nudist camp. Melton examined Venusian Church literature, interviewed members of the organization, and visited the Longhouse. Melton classified the Venusian Church as *120 a brand of neopaganism. OPINION Charitable contributions cannot be deducted unless contributed to organizations described in section 170(c). Pursuant to section 170(c), petitioners' contributions are not deductible unless the Venusian Church was "organized and operated exclusively for religious * * * purposes * * *; and * * * no part of the net earnings of which inures to the benefit of any * * * individual." Sec. 170(c)(2)(B) and (C). The regulations under section 501(c)(3) which determine whether a religious organization is a qualified tax exempt organization, may be utilized to determine whether petitioners' contributions to the Venusian Church are deductible as the requirements of section 501(c)(3) parallel those of section 170(c). Canada v. Commissioner,82 T.C. 973, 980 n. 12 (1984). See also Calvin K. of Oakknoll v. Commissioner,69 T.C. 770 (1978), affd. by order 603 F.2d 211 (2d Cir. 1979). Consequently, the central issue of this case is whether the Venusian Church is exempt from Federal income tax pursuant to section 501(a) as an organization described in section 501(c)(3). The burden of proof rests with petitioners. *121 Rule 142(a). An organization is operated "exclusively" for exempt purposes if its activities primarily serve one or more exempt purposes and not, except to an insubstantial degree, a nonexempt purpose. Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. The existence of a "single * * * [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." Better Business Bureau v. United States,326 U.S. 279, 283 (1945). See also Nat. Association of American Churches v. Commissioner,82 T.C. 18, 28-29 (1984). Any nonexempt purpose of the organization must be merely incidental. Copyright Clearance Center, Inc. v. Commissioner,79 T.C. 793 (1982). The purposes for which an organization is operated are discerned not from the organization's activities but from the end for which those activities are undertaken. Golden Rule Church Association v. Commissioner,41 T.C. 719, 728 (1964). If an organization's activities normally constitute a trade or business, the taxpayer will not necessarily be disqualified from the exempt status provided the activities *122 further an exempt purpose, B.S.W. Group v. Commissioner,70 T.C. 352, 357 (1978), and the organization serves public rather than private interests such that no benefit inures to a private individual. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs. Although the presence of substantial profits is not necessarily determinative of a commercial purpose, such profits constitute "evidence indicative of a commercial character." Church of Scientology of California v. Commissioner,83 T.C. 381, 480 (1984), on appeal (9th Cir., June 3, 1985), and cases cited therein. We must decide toward what end the activities of the Venusian Church are directed and whether such activities are "animated" by a substantial commercial purpose. Better Business Bureau v. United States,supra at 284. Among the factors relevant to our determination are the particular manner in which an organization conducts its activities, the commercial hue of those activities, and the existence and amount of annual or accumulated profits. B.S.W. Group, Inc. v. Commissioner,supra at 357. The existence of any of these factors supports a conclusion that *123 an organization was not operated exclusively for an exempt purpose. Church of Scientology of California v. Commissioner,supra at 475. Petitioners assert that the Venusian Church was an exempt organization within the meaning of section 501(c)(3) such that petitioners are entitled to deduct as charitable contribution amounts paid to that organization pursuant to section 170. Respondent asserts that the Venusian Church was organized and operated for commercial purposes in the furtherance a substantial nonexempt purpose. We agree with respondent. We preface our analysis in support of our conclusion by emphasizing that the rejection of petitioners' position turns solely on our application of the organizational and operational standard. Sec. 170; sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. We are convinced that the Venusian Church satisfies neither the nonexempt purpose test nor the private inurement test. The record is replete with evidence that the Venusian Church was operated as a commercial enterprise and that substantial benefit inured to private individuals. We avoid the "most delicate question" of whether the beliefs of the members of the Venusian Church *124 were in fact religious or whether such views merely represented a deeply held philosophy or life-style. Wisconsin v. Yoder,406 U.S. 205, 215-216 (1972); Canada v. Commissioner,82 T.C. 973, 982-983 (1984). We note at this juncture that section 170 does not unconstitutionally prefer one religion over another by allowing deductions only for contributions to qualified tax exempt entities. See Kessler v. Commissioner, 87 T.C.     (Dec. 8, 1986). The Temple was located in the area of Seattle, Washington, sometimes referred to as an adult entertainment district or zone. Machine contributions were from either the exhibition of sexually explicit films or from the sexually explicit live performances. Gross revenue from such sources approximated seventy-five percent (75%) of the total revenue realized by the Venusian Church during the fiscal year end July 31, 1980. Patrons at the Temple were certainly expected to pay for the opportunity to observe the film and performances at the Temple. Petitioners' assert that the Temple was located with an area where adult bookstores and theatres are situated by design so as to act as an information center *125 for the Venusian Church and to proselytize patrons of adult entertainment establishments. We find such statements insufficient to overcome the obvious and inescapable conclusion that the Temple was located within that specific area of Seattle, Washington to maximize commercial exploitation of sexually explicit films and live performances. We find that the activities at the Temple were designed for predominate commercial purposes and that such purposes were not merely incidental to otherwise exempt activities. Petitioners feeble attempt to characterize coin operated deposit boxes as "donations" within the Temple is indicative of petitioners' effort to masquerade its commercial enterprise in the verisimilitude of attributes typically associated with tax exempt religious organizations. Petitioners assert that the fees charged by Venusian Church were merely self supporting fees not designed for profit. In this context, petitioners note the apparent operating loss of the Venusian Church for fiscal year and July 31, 1980. Upon our examination of the financial records we find as suspect certain expenses not indicative of furthering an exempt purpose. In particular, employee wages in *126 the amount of $54,071.08 is disproportionate on a factual basis to the furtherance of any possible tax exempt purpose. In contrast such amount appears reasonable in the commercial enterprise context. Furthermore, we find the expenses concerning poverty assistance in the amount of $10,200.00 to Cain and the parsonage allowance in the amount of $5,203.08 to Gearon to merely be a reclassification of employer wages. Cain performed in the live performances and Gearon was, in essence, the business manager of the Temple. In sum, we find no substantial distinction between the Temple and other commercial purveyors of sexually explicit material. Consequently, the Temple operated a substantial commercial enterprise in the furtherance of a nonexempt purpose. Our determination that the Temple was operated as a commercial enterprise in the furtherance of a substantial nonexempt purpose is dispositive of our inquiry as to the exempt status of the Venusian Church. Nonetheless, we are impelled to impart our determination that the retreat facility referred to as Armac was also operated in the furtherance of a substantial nonexempt purpose. We find that Armac was operated as a recreation facility, *127 the use of which was dependent upon payment of the $250.00 membership fee. Petitioners assert that Armac was the center of the Venusian Church which provided a special environment for members to attune to nature. We find it indisputable that Armac offered recreational facilities of a typical retreat or lodge. Where a recreational facility or vacation retreat is utilized substantially for recreational purposes, a substantial nonexempt purpose exists. Schoger Foundation v. Commissioner,76 T.C. 380 (1981). Petitioners have failed to demonstrate that the predominate use of Armac was tied to the religious activities of the Venusian Church. Schoger Foundation v. Commissioner,supra at 388. We find no evidence to indicate that reasonable controls were designed to assure that individuals who participated in the group activities at Armac were active participants in the Venusian Church. Compare Junaluska Assembly Housing, Inc. v. Commissioner,86 T.C. 1114, 1124 (1986). The activities at Armac were available to any individual who purchased a membership. We find this fact to be indicative that Armac was operated for commercial purposes *128 as advertised to patrons of the Temple. Compare Junaluska Assembly Housing, Inc. v. Commissioner,supra at 1124. Petitioners have failed to satisfy the requirement that no part of the net earnings of the Venusian inured to the private benefit of any individual. Sec. 170(c)(2)(C); sec. 1.501(c)(3)-1(c)(2), Income Tax Regs. Prohibited inurement is strongly suggested where an individual or small group has exclusive control over the management of the organization's funds. Church of Eternal Life and Liberty, Inc.,86 T.C. 916 (1986); Church of the Transfiguring Spirit v. Commissioner,76 T.C. 1, 7 (1981); Basic Bible Church v. Commissioner,74 T.C. 846, 857 (1980). The basic tenet of the inurement prohibition is to ensure that an exempt charitable organization serves a public, rather than a private interest. Triune of Life Church, Inc. v. Commissioner,85 T.C. 45, 55 (1985). That the benefit conveyed may be relatively small does not alter the basic fact of prohibited inurement. Triune of Life Church, Inc. v. Commissioner, affd. without published opinion 791 F.2d 922 (3d Cir. 1986). *129 We are convinced that the Venusian Church fails to satisfy the prohibited inurement requirement of section 170(c)(2)(C). The Venusian Church offered no articles of incorporation or charter to delineate the prescriptions of the perceived exempt purposes of such organization. Petersen stated that the Venusian Church was simply governed by members. We find incredible Petersen's testimony that one hundred active members and as many as fifteen hundred occasional members were capable of democratic or egalitarian management of significant assets and the establishment of doctrinal theological policies. We are satisfied that Petersen exercised significant domination as to policies and activities of the Venusian Church. Petersen had signatory control concerning Venusian Church funds. Petitioners resided at Armac without cost. The Venusian Church paid certain personal expenses at the Issaquah, Washington apartment. The absence of the Venusian Church articles of incorporation presents an unanswered dilemma as to the distribution of Venusian Church assets upon dissolution. We are convinced that private benefit would inure to petitioners upon dissolution of the Venusian Church due to the *130 influence of Petersen upon that organization. We determine that the Venusian was not organized or operated exclusively for religious purposes and that some part of the net earnings of the Venusian Church inured to the benefit of private individuals. Consequently, petitioners are not entitled to deduct any amount paid to the Venusian Church pursuant to section 170. Section 6653(a) provides for an addition to tax of five percent of any underpayment which is due to negligence or intentional disregard of rules or regulations. Petitioners bear the burden of proof that their 1979 underpayment of tax was not due to negligence or intentional disregard of rules and regulations. Enoch v. Commissioner,57 T.C. 781, 802 (1972). We are convinced that a reasonable and prudent person would recognize that the activities at the Temple were in the furtherance of a substantial commercial enterprise. We found Petersen to be an intelligent and articulate individual who, at a minimum, should have been aware that commercial aspects of the Temple disqualified the Venusian Church from tax exempt status. Indeed, Petersen was aware that the Internal Revenue Service had denied the application *131 for recognition of tax exemption by the Venusian Church in a prior year. Petitioners are liable for an addition to tax pursuant to section 6653(a) as determined by respondent. Respondent, within the answer, requests damages pursuant to section 6673. Section 6673 provides that the Tax Court may award damages not in excess of $5,000.00 whenever it appears that the taxpayer instituted or maintained proceedings primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless. We decline to award damages pursuant to section 6673. We are not convinced that petitioners maintained this action primarily for delay and we will extend the benefit of doubt as to whether these proceedings were frivolous or groundless within the meaning of section 6673. We acknowledge that the facts of the instant case are somewhat unique and capable of distinction from the plethora of cases concerning tax protestor sponsored "churches" where we have awarded damages without hesitation. Kalgaard v. Commissioner,764 F.2d 1322 (9th Cir. 1985), affg. T.C. Memo. 1984-283. [4]
*132 To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Tax Court Rules of Practice and Procedure. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Petitioners also donated an automobile and furniture to the Venusian Church valued in the aggregate sum of $3,150.00 for deduction purposes on their 1977 Federal income tax return.↩
3. Certain Ellwest Stereo Corporations were the subject of an unrelated case. Jolar Cinema, Inc. v. Commissioner,T.C. Memo. 1983-403↩.
4. Pryor v. Commissioner,T.C. Memo. 1985-489. Snodgrass v. Commissioner,T.C. Memo. 1984-435↩.