TRIUNE OF LIFE CHURCH, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11175–83X.    Filed July 24, 1985.

*Alvin S. Moses* and *Mark C. Schultz*, for the petitioner.
*Linda S. Bednarz*, for the respondent.

OPINION

STERRETT, *Chief Judge*: This is an action for declaratory judgment under section 7428, I.R.C. 1954. At issue is petitioner's status as a tax-exempt religious organization under section 501(c)(3). Resolution of that issue turns on: (1) Whether petitioner is operated exclusively for exempt purposes; and (2) whether any part of petitioner's net earnings inures to the benefit of any private individual.

Petitioner filed an application with the Internal Revenue Service for recognition of exemption from Federal income tax under section 501(c)(3), claiming therein to be a church.

On February 9, 1983, the Service issued a final adverse determination. The following reasons were given as the basis for said determination:

(1) You are not operated exclusively for a religious purpose.

(2) You are operated for the private interest of the incorporators and creators.

(3) Your net earnings inure to the benefit of private individuals.

Having exhausted all of its administrative remedies as required by section 7428(b)(2), petitioner has invoked the jurisdiction of this Court for a declaratory judgment pursuant to section 7428.

The parties have filed with the Court the entire administrative record and have stipulated to its genuineness.[1] The stipulated administrative record is incorporated herein by this reference. Our decision will be based upon the assumption that the facts as represented in the administrative record are true for purposes of this proceeding. Rule 217(b)(1), Tax Court Rules of Practice and Procedure.[2]

The Triune of Life Church (petitioner) was incorporated as a nonprofit corporation under the laws of the State of Pennsylvania on December 24, 1979. It is located at 7151 Frankford Avenue, Philadelphia, Pennsylvania.

Petitioner's articles of incorporation originally stated its purposes as follows:

1. To form and maintain a congregation committed to the religious doctrine of the Triune of Life.

2. To conduct religious services and to perform spineology [sic] and other religious sacraments.

3. To study, teach, publish, promote, and practice the doctrine of the Triune of Life.

4. To cooperate with other groups and individuals in service to Universal Intelligence and to the Triune of Life.

5. To train spineologists [sic] to conduct and perform the sacraments in accordance with the doctrine.

---

[1]Petitioner filed a motion to supplement the administrative record. After hearing, the Court denied petitioner's motion.

[2]All Rule references herein are to the Tax Court Rules of Practice and Procedure.

6. To maintain and operate instructional institutions, each to be known as a spinal tutoriun [sic] and to ordain as spinologists such persons as are deemed by the Board of Trustees to be qualified.

Petitioner's articles of incorporation were amended on July 7, 1981, to provide, in effect, that (1) no part of its net earnings shall inure to the benefit of any private person; (2) no substantial part of its activities shall consist of carrying on propaganda or otherwise attempting to influence legislation; (3) it shall not engage in any other activity not permitted to be carried on by a corporation exempt from Federal income tax under section 501(c)(3) or by a corporation, contributions to which are deductible under section 170(c)(2); and (4) upon dissolution, assets will be distributed for an exempt purpose recognized under section 501(c)(3).

The founder and president of petitioner is Dr. Reginald Gold, who had written and published a book entitled "Triune of Life," which served as inspiration for the establishment of the doctrine of the church. Dr. Gold had been a practicing doctor of chiropractic and an educator in a chiropractic college.

Petitioner is dedicated to the doctrine of the Triune of Life. That doctrine has three components: intelligence, matter, and force. The sole sacrament currently administered by petitioner is that of spinology. The object of spinology is to restore human beings to harmonious unity of mind, spirit, and body for the fulfillment of life. Petitioner's doctrine teaches that, sometimes, when an individual is spiritually inhibited from expressing his or her full life potential, there is a physical manifestation. Spinology seeks to correct this spiritual problem by the physical sacrament of spinology, which involves a gentle laying of the hands on the person by a certified spinologist. Pamphlets entitled "Open Up Your Life by studing to be a Certified Spinologist then open up the lives of others" and "Dare With Us Care With Us Share With Us explore an exciting new career opportunity as a Certified Spinologist" describe spinology as follows:

Spinologists envision a world in which people dwell in harmony, and seek to bring this about by helping people express their full life potential.

Spinology is based upon a profound respect for the totality of life and the fact that the nerve system maintains the totality by directing all functions.

The human body consists of some 25 to 30 quadrillion cells, all working together for the purpose of expressing full life potential. It is obvious that coordination of the thousands and thousands of biological processes necessary to maintain life is dependent upon a control system. The brain, spinal cord and millions of miles of nerve fibers form the control system in human beings.

This magnificent communications network is protected by a framework of solid bone. The brain, enclosed in a housing known as the skull, has extensions reaching out to virtually every organ and tissue in the body. The most vulnerable part of the system is an extension of the brain known as the spinal cord. This vital and vulnerable life-line is housed within 24 movable bones that comprise the spinal column, or "backbone." These spinal bones protect the delicate nerve trunks.

Should a bone of the spine become jarred from its proper position, however, the bones could compress the very nerve trunks they are meant to protect. Such compression interferes with the flow of nerve impulses, and the 25 to 30 quadrillion cells of the body can no longer work together as one functional unit. The individual then is no longer able to express full life potential.

The purpose of spinology is the correction of such interference. The spinologist gently applies the hands to the spine, enabling the body to correct any deviations that interfere with the flow of life energy. This restores the ability of the body to express its full and harmonious life potential.

Only when the human body is thus in harmony with itself can it achieve harmony with others for a better world.

There are four categories of people who play roles in petitioner's organizational scheme:

A. *Members* (sometimes referred to as "Recipients"): each member receives the sacrament of Spinology and participates in the religious philosophy and doctrinal services of the Church.

B. *Spinologist* (sometimes referred to as "Affiliate"): a Spinologist is a leader of a congregation. The responsibilities of the Spinologist include spreading and sharing the doctrine of the Church, leading services, and administering the sacrament of Spinology to various members of the Church.

C. *Trainee*: a trainee is a Spinologist in training. The Trainee also participates in daily services.

D. *Board of Elders*: This group consists of those Affiliates who have been elected by the corporate members to advise the Church and the public. * * *

One of petitioner's tenets teaches evangelism, which is accomplished primarily through the efforts of the spinologists, who are expected to start and lead their own congregations. A new spinologist may obtain congregants through speaking engagements, advertising, and through the spreading of the faith by fellow congregants. When a potential congregant

inquires about membership in any particular spinologist's congregation, the following procedure is always instituted:

a. The potential congregant is invited to an initiation which will usually take approximately one hour. The potential congregant is urged to bring his or her spouse and all children age twelve or older to participate in this initiation.

b. At the initiation, the congregant is informed of the basic tenets of the Church, and is required to make a commitment to them.

c. The basic purpose of the sacrament of Spinology is also explained to the prospective congregant and each family member. They are further informed that the object of the sacrament is to restore human beings to harmonious unity of mind, spirit, and body for the fulfillment of life; and that the gentle laying of hands on the member's body will help achieve this unity.

d. The prospective congregant is informed that membership will require that each member of the family receive the sacrament of the Church initially three times per week and thereafter weekly.

e. The congregant is also informed as to the time and location of monthly doctrinal instructions and religious services which are conducted by the affiliated Spinologist. All members of the family are required to attend, especially those who continue to receive the sacrament of Spinology. The purpose of these monthly services is to orient the new congregant into the philosophy of the Church which affects every aspect of his life. Accordingly, the congregant is informed that attendance at these religious services is a prerequisite to for [sic] the privilege of continuing membership in the congregation.

f. The Spinologist also explains in detail membership dues. For those potential congregants who are in need and cannot afford to pay the usual membership dues, the Spinologist, as part of his or her responsibilities to the Church, will adjust or waive the membership dues provided that the congregant accepts the tenets of the Church and agrees to live according to them.

g. Once admitted into membership, should any member of the Church fail to attend monthly services or sacramental sessions, then he or she may be severed from membership in the Church without further cause.

h. Services conducted by Spinologists resemble "Meetings" of the Society of Friends (Quaker) more than any other large organized religious group. They do not, however, involve communal worship or responsive reading. At each service, some phase of the Church doctrine is explored and expressed, either by the Spinologist conducting the service or by a congregant.

Each spinologist conducts services with his or her own congregation at least once per month. In addition, services are conducted twice daily at petitioner's location at 7151 Frankford Avenue, Philadelphia, Pennsylvania.

Petitioner owns and operates the Philadelphia Spinal Tutorium (Tutorium), a training institution for spinologists. The

Tutorium is located at the same address as petitioner. Dr. Gold is an administrator and instructor at the Tutorium.

To become a spinologist in petitioner's organization, one must successfully complete the training course given by the Tutorium and commit oneself to live by the doctrine of the organization. The training course is a 1-year program of 3 trimesters of 12 weeks each. Classes are conducted twice daily and trainees are given a choice of attending either of the two sessions. Tuition for the training program at the Tutorium is $3,000 per student. A pamphlet published in connection with the program states as follows:

> Philadelphia Spinal Tutorium is an affiliate of the Triune of Life Church, and as such is authorized by the Church to train Spinologists.
>
> Upon satisfactory completion of the course at the Philadelphia Spinal Tutorium, an appropriate certificate of completion is awarded. Holders of this certificate are eligible to become ordained by the Triune of Life Church as Spinologists. * * *

The pamphlet also states:

> Prospective students are advised that the practice of the healing arts in the United States is regulated by licensing laws. Any prospective student seeking to practice a healing arts profession in the United States is advised to enroll not in the Philadelphia Spinal Tutorium, but in an appropriate healing arts school. The Spinology course at the Philadelphia Spinal Tutorium does not prepare its students for licensure in any healing art.

Recipients of the sacrament of spinology are required to pay dues to the spinologist administering the sacrament. A spinologist may adjust or waive such dues for those potential congregants who cannot afford to pay them. Part of a spinologist's agreement to live by petitioner's doctrine is an agreement to pay a tithe to petitioner. Spinologists are exempt from tithing during their first year of practice.

The original capital for funding petitioner's organization was received by loans from Dr. Gold and one Miguel Bolufer, an elder leading a congregation in Spain. The loans were in the amounts of $45,000 and $32,169, respectively, and carried simple interest at the rate of 10 percent per annum. Petitioner also derives financial support from tuitions, dues, and donations.

Petitioner's income statement for its first year of existence reflects the following:

TRIUNE OF LIFE CHURCH, INC.
STATEMENT OF INCOME
ELEVEN MONTHS ENDED MARCH 31, 1981

| | | |
|---|---:|---:|
| SALES - TABLES AND SUPPLIES | | $4,904 |
| COST OF GOODS SOLD | | |
| Beginning inventory | $4,230 | |
| Purchases | 7,541 | |
| Freight | 266 | |
| Goods available for sale | 12,037 | |
| Less: Ending inventory | 8,122 | |
| TOTAL COST OF GOODS SOLD | | 3,915 |
| GROSS PROFIT | | 989 |
| TUITION INCOME | | 71,268 |
| TOTAL INCOME | | 72,257 |
| OPERATING EXPENSES | | |
| Advertising and publicity | $6,230 | |
| Contributions | 20 | |
| Depreciation | 5,674 | |
| Dues and subscriptions | 45 | |
| Graduation expense | 1,529 | |
| Insurance | 439 | |
| Interest | 3,703 | |
| Office supplies and expense | 2,058 | |
| Postage | 792 | |
| Printing | 6,737 | |
| Professional fees | 5,355 | |
| Recruitment and travel | 8,454 | |
| Rent | 14,850 | |
| Repairs and maintenance | 447 | |
| Salaries | 11,222 | |
| Taxes and licenses | 329 | |
| Telephone | 1,855 | |
| Tutorium supplies and expense | 692 | |
| Miscellaneous expense | 300 | |
| TOTAL OPERATING EXPENSES | | 70,731 |
| OPERATING INCOME | | 1,526 |
| Interest Income | | 363 |
| NET INCOME | | 1,889 |

Petitioner does not anticipate making any contributions to charities.

As of March 3, 1982, petitioner had achieved a degree of international recognition. At that time, there were more than 5,000 members—2,800 in the United States, 2,000 in Spain, and various undetermined numbers in Ireland, Mexico, and South Africa.

None of the officers of petitioner have received salaries, gifts, bonuses, or living expense reimbursements. Dr. Gold has devoted 40 to 80 hours per week to petitioner's activities and is not otherwise employed. Although Dr. Gold actually has received no salary thus far, he is accruing salary.

Sections 501(a) and 501(c)(3) provide an exemption from Federal income tax for organizations devoted to religious purposes if three prerequisites are satisfied: (1) The organization must be organized and operated exclusively for religious purposes or in conjunction with other exempt purposes; (2) no part of its net earnings may inure to the benefit of any private shareholder or individual; and (3) no substantial part of its activities may be devoted to political or lobbying activity.

Petitioner applied for recognition of tax-exempt status as a section 501(c)(3) religious organization. Respondent rendered an adverse determination with respect to said application on the grounds that: (1) Petitioner is not operated exclusively for a religious purpose; (2) petitioner is operated for the private interest of its incorporators or creators; and (3) part of petitioner's net earnings inures to the benefit of private individuals. It is only these grounds for denial of tax-exempt status that we must consider. *Houston Lawyer Referral Service v. Commissioner*, 69 T.C. 570, 573–574 (1978).

The burden of proof is on petitioner to overcome the grounds set forth in respondent's notice of determination. Rule 217(c)(2)(i); *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488, 492 (1977). Moreover, the requirements for exemption under section 501(c)(3) are stated in the conjunctive, and failure to satisfy any one of them will prevent exemption. *Stevens Bros. Foundation, Inc. v. Commissioner*, 39 T.C. 93, 110 (1962), affd. in part and revd. in part 324 F.2d 633 (8th Cir. 1963), cert. denied 376 U.S. 969 (1964). Thus, to prevail herein, petitioner must prove not only that it is operated exclusively for religious purposes, but also that no part of its net earnings inures to the benefit of any private individual. We conclude that petitioner has failed to carry its burden of proof.

Section 1.501(c)(3)–1(c)(1), Income Tax Regs., elaborates on the requirement that the organization be operated exclusively for exempt purposes by providing as follows:

(c) *Operational test*—(1) *Primary activities*: An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.

If the nonexempt activities of an organization are more than incidental or insubstantial, the organization is not entitled to exemption, regardless of the number or importance of its exempt purposes. *Better Business Bureau v. United States*, 326 U.S. 279 (1945); *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 804 (1982).

It is not the nature of an organization's activities, but rather the purpose towards which they are directed that is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization exempt from tax under section 501(a). The fact that an organization's activities constitute a trade or business does not, of itself, disqualify the organization under section 501(c)(3), provided the activities serve an exempt purpose.

Respondent asserts that petitioner has failed to supply sufficient information to establish that it meets the operational test. He contends that the information supplied indicates that petitioner may be operated for a substantial nonexempt purpose such as training and practicing an art similar to the art of chiropractic through which the private interests of the members of petitioner are served. Respondent notes that although petitioner claims that the practice of spinology differs from the practice of chiropractic, there is a basic similarity in that in both instances spinal manipulation is performed for a fee.

We agree with respondent that petitioner has failed to supply sufficient information to justify a determination that it is operated exclusively for exempt purposes.

The information supplied indicates that petitioner was founded by Dr. Reginald Gold, a chiropractor and an educator in a chiropractic college. Petitioner and the Tutorium, which it owns and operates, are operated from the same location. Petitioner holds services twice daily. The Tutorium holds classes twice daily. The only sacrament currently being administered by petitioner is spinology, which involves the

gentle laying of the hands on a person by a certified spinologist. To become a spinologist in petitioner's organization, one must successfully complete the training course given by the Philadelphia Spinal Tutorium and agree to live by the doctrine of the organization. Tuition for the training course is $3,000 per year per student. Each spinologist conducts services with his or her own congregants at least once per month. Recipients of the sacrament of spinology are required to pay dues of an undisclosed amount to the spinologist administering the sacrament. A component of a spinologist's agreement to live by petitioner's doctrine is an agreement to pay a "tithe" to petitioner. The amount of the tithe required to be paid was not disclosed by petitioner, but there is some suggestion in the record that the amount of tithes is based on the amount of dues collected from the administration of the sacrament.[3]

Based on a review of the administrative record, we find that we are unable to disagree with respondent's assertion that a very substantial purpose of petitioner appears to be the training and practicing of an art akin to chiropractic. We note, in this connection, that one of the pamphlets contained in the administrative file is entitled, "Dare With Us Care With Us Share With Us explore an exciting new career opportunity as a Certified Spinologist." Pursuit of a professional practice or career is not one of the exempt purposes listed in section 501(c)(3).[4]

What we gather from the administrative record is that petitioner's organization, for a fee of $3,000, in substance, offers a training course which, when successfully completed, permits the graduate to practice the sacrament of spinology, an art that bears a striking resemblance to chiropractic. Recipients of the sacrament are required to compensate those who administer the sacrament, and the latter, in turn, are required to pay tithes to petitioner. Respondent contends that the overall arrangement indicates that petitioner is operated for the private benefit of its members, since the spinologists are compensated for rendering services akin to those rendered by chiropractors. In our view, respondent reasonably so in-

---

[3]Since spinologists are exempt from tithing during their first year of practice, petitioner's income statement for its first year of existence does not show an entry for tithes.

[4]See *Labrenz Foundation, Inc. v. Commissioner*, T.C. Memo. 1974–296 (involving a foundation that provided chiropractic services).

ferred from the information submitted by petitioner. In addition, based on the administrative record before us, we believe petitioner had a disqualifying nonexempt purpose that is substantial in nature of operating a commercial business to produce net profits for petitioner in the form of tuitions and "tithes."

Moreover, we are not satisfied that no part of the net earnings of petitioner inures to the benefit of any private individual within the meaning of section 501(c)(3).

The inurement prohibition under section 501(c)(3) denies exempt status to an organization whose founders or controlling members have a personal stake in that organization's receipts. *Church of Scientology of California v. Commissioner*, 83 T.C. 381, 491 (1984), on appeal (9th Cir., June 3, 1985). The basic thrust of the concept of private inurement is to ensure that an exempt charitable organization is serving a public and not a private interest. *Church of Scientology of California v. Commissioner*, *supra* at 491. Net earnings may inure to an individual in any of a number of ways other than by actual distribution of dividends. *Unitary Mission Church v. Commissioner*, 74 T.C. 507, 512–513 (1980), affd. without published opinion 647 F.2d 163 (2d Cir. 1981); *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 497, 412 F.2d 1197, 1200 (1969), cert. denied 397 U.S. 1009 (1970). That the benefit conveyed may be relatively small does not change the basic fact of inurement. *Founding Church of Scientology v. United States*, 412 F.2d at 1200.

Petitioner admits that the income statement submitted and made a part of the administrative record reflects the operations of only the first year of petitioner's existence and does not represent anticipated income, including tithes and dues. In addition, because petitioner does not intend to make any donations to charity, it is unclear for whose benefit the funds received will be expended.

Petitioner's income statement indicates that $6,230 was expended on advertising. However, when respondent requested petitioner to provide copies of bulletins, announcements, or other documentation that services were being held, petitioner responded that "The Church feels that bulletins advertising services would be inappropriate and does not utilize them." Petitioner also stated that the $6,230 expenditure for "adver-

tising" represented sums "used to recruit new trainees, to proselytize and to spread the doctrine of the Church."

In addition to the $6,230 that petitioner claims was spent for recruitment, petitioner's income statement shows that $8,454 was spent for "recruitment and travel." Petitioner claims that this latter expense was incurred as a result of the evangelical responsibilities of Dr. Gold in conducting lecture tours in France, Spain, and Africa. Petitioner submitted absolutely no documentation whatsoever with respect to these trips.

Petitioner's income statement also shows an entry for salary expense in the amount of $11,222. The administrative record is unclear with respect to the identity of the employees to whom the salaries were paid. Petitioner claims that Dr. Gold has received no salary thus far but that "he is accruing same and hopes the Church will be able to afford to pay him for his services some time in the near future." Petitioner's income statement, however, contains no entry for accrued salaries and petitioner has submitted no information with respect to how much salary Dr. Gold has accrued or will collect in the future.

The administrative record is simply too sketchy to support the conclusion that petitioner has carried its burden of proving that no part of its net earnings inures to the benefit of any private individual.

Since petitioner has failed to prove that it meets all of the requirements of section 501(c)(3), we hold that it does not qualify for tax-exempt status.

*An appropriate order will be entered.*

