FREDERICK H. DOBBS AND SHERRILL R. DOBBS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dobbs v. Commissioner
Docket No. 32593-84.
United States Tax Court
T.C. Memo 1987-361; 1987 Tax Ct. Memo LEXIS 361; 53 T.C.M. (CCH) 1416; T.C.M. (RIA) 87361; July 23, 1987. Stephen G. Salley and Allison E. Sundberg, for the petitioners. Gary F. Walker, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years 1980 and 1981 in the amounts of $ 20,700 and $ 24,047, respectively. By first amendment to answer respondent claimed *363 for each of the years 1980 and 1981 the increased interest rate of deficiencies with respect to substantial underpayments attributable to tax motivated transactions, pursuant to section 6621(d)[1] [now designated section 6621(c), Internal Revenue Code of 1986] and by second amendment to answer respondent claimed damages under section 6673 for taxable year 1980 and additions to tax under section 6659 and damages under section 6673 for taxable year 1981. One of the issues raised by the pleadings has been disposed of by agreement of the parties leaving for our decision: (1) Whether petitioners' investment in computer equipment was made with a profit objective so as to entitle them to depreciation deductions under section 167, and if they are entitled to such deductions, the basis on which depreciation should be computed. (2) Whether the computer equipment transaction was entered into solely for tax avoidance and for that reason should be disregarded in its entirety for tax purposes. (3) Whether petitioners are entitled to deduct the interest expense attributable to the recourse and/or nonrecourse indebtedness incurred as part of the purchase price of *364 the computer equipment. (4) Whether petitioners' transaction is a tax-motivated transaction within the meaning of section 6621(c). (5) Whether petitioners overvalued the computer equipment, and if so, whether the value claimed was more than 150 percent of the correct value so as to constitute a valuation overstatement within the meaning of section 6659? and (6) Whether damages under section 6673 should be awarded to respondent on the ground that petitioners' position is frivolous or the proceeding was instituted or maintained primarily for delay? FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Frederick H. Dobbs [2] and Sherrill R. Dobbs, husband and wife, who resided in Titusville, Florida at the time of the filing of their petition in this case, filed joint Federal income tax returns for the taxable years 1980 and 1981 on the cash basis method of accounting with the Internal Revenue Service Center in Atlanta, Georgia. At all relevant *365 times petitioner practiced medicine as a radiologist in Titusville, Florida, as an employee of Space Coast Radiology Associates ("the corporation"). For a period of 5 years prior to July 1980 the corporation leased certain computer equipment to do its billing. Over that 5-year period the corporation paid $ 90,000 in lease payments. Before the lease expired the corporation approached the lessor about re-leasing or purchasing the equipment. The lessor offered offered to re-lease under the same terms or to sell for approximately $ 90,000. These proposals were unacceptable to the corporation. In early 1980 several principals in the corporation became interested in acquiring a computer for the purpose of leasing it for profit to another corporation, Physician Computer Service ("PCS"). They intended to form PCS to engage in the business of providing computerized billing services for their corporation and other physicians in the community. These principals secured the services of the Dean of the School of Computer Science at the University of Central Florida, who had expertise in the computer field, to research what it would cost to purchase a computer to do this billing work. *366 The Professor recommended that the principals purchase a Wang computer for $ 45,000 and lease it to the corporation which they did on July 1, 1980. This business venture yielded a complete payoff of the purchase price from first year receipts. In July 1980 petitioner had no individual expertise with respect to computer selection, maintenance or operation and has not subsequently attempted to gain such expertise. In December 1980 at the suggestion of the Mr. Robert Goldman, petitioner individually entered into a 10-year transaction to purchase certain used I.B.M computer equipment at a cost of $ 174,853. Robert Goldman (Mr. Goldman) is a stockbroker and investment adviser in Winter Park, Florida. Petitioner's initial business dealings with Mr. Goldman involved the investment of petitioner's pension plan. In 1980 petitioner told Mr. Goldman that he anticipated receiving funds from the sale of a piece of real property which had substantially appreciated in value. In July or August 1980, Mr. Goldman suggested that petitioner consider an equipment transaction offered by Cambridge Equipment Leasing Company as a means of reinvesting the sales proceeds from the anticipated *367 real estate sale. Petitioner decided to enter into this transaction and as buyer signed a document dated December 24, 1980 captioned "Purchase Agreement Assignment" the subject of which was the equipment with the price and payment schedule as shown: EQUIPMENT LIST
Description of Items of Equipment
Serial Number
S20479 (feature): Dynamic
attached to IBM
Addr. Trans.
3155-102
Serial #10610
List Price
$ 156,119
Selling Price
$ 174,853
Payment Schedule
- $ 174,853 (Selling Price)
Cash Payments:
$   8,306 on closing;
$  14,225 on January 2, 1981; and
$   9,617 on January 2, 1982
Note:
$ 142,505 ($ 100,000 recourse)
Lease Schedule
Lessee
Lease Number
Date of Lease
ITT World Communications,
ITT-02
August 21, 1978
Inc. (User)
DPF Incorporated (Sublessee)
DPF-1
May 30, 1980
Computer Equipment
CEI-13
November 10, 1980
Investors, Inc.
Lien Schedule
Lienholder
Amount
Union Bank of California
$ 428,432
DPF Incorporated
$ 373,702
Computer Equipment
$ 419,391
Investors, Inc.
*368 The phrase "Dynamic Addr. Trans." appearing on the "Equipment List" is nomenclature for equipment sometimes referred to as a dynamic address translator. The terms "DAT Box", "DAT Facility" or "DAT" are also used as acronyms for this piece of equipment. The phrase "IBM 3155-102" appearing on the "Equipment List" is nomenclature for equipment sometimes referred to as an IBM central processing unit, Model 370/155 (hereinafter "CPU"). A DAT Box is a feature which attaches to the "CPU" and expands its memory capacity, allowing the "CPU" to execute larger computer programs. Pages 1-2 of the "Amended Investment Memorandum" ("investment memo") state that at the time petitioner entered into the transaction the "Equipment" was installed and in service at a facility of I.T.T. World Communications, Inc. ("ITT"). The investment memo details the "sequence of transactions" involving the equipment as follows:
6. Sequence of Transactions
The following is a summary description of the entire sequence of transactions involved in the purchase of the Equipment. This summary is subject to detailed explanations and risks, as set forth and described elsewhere in the Memorandum, and *369 is intended only to familiarize prospective Purchasers with the complex relationships among the various parties. (a) DPF Incorporated ("DPF") purchased the Equipment from IBM, the original equipment manufacturer, on or about the several dates of execution of each User Lease Supplement. As part of its financing, DPF granted the Lending Bank a security interest in the Equipment and the User Lease as collateral security for the repayment of the indebtedness (such security interest hereinafter the "Lending Bank Lien"). (b) Sums due from International Telephone and Telegram Corporation (the "User") during the term of the User Lease will be sufficient to fully satisfy the Lending Bank indebtedness. Receipt of rentals by DPF thereafter, and the sharing of any net rentals derived therefrom, if any, is therefore dependent upon renewal by the User or the releasing of the Equipment by DPF to another user. (c) In May 1980, Cambridge Equipment Investors, Inc. (the "Equipment Company") purchased the Equipment from DPF for cash and notes and, as part of such purchase transactions, granted DPF a lien in the Equipment and in the User Lease and, in addition, in the DPF Lease as collateral security *370 for the repayment of the indebtedness (such security interests hereinafter the "DPF Lien"). (d) Cambridge Equipment Leasing Corporation (the "Seller"), in turn, purchased the Equipment from the Equipment Company in June and November 1980. In each such transaction, the purchase price was represented by the Seller and by independent appraisal as the then current recommended IBM retail list price and, in each case, is payable in cash and by nonrecourse promissory notes of the Seller. (e) As owner of the Equipment, the Seller thereupon leased the Equipment back to the Equipment Company pursuant to two separable leases each of which are identical in all material respects, except with respect to the Equipment covered and the rental payable, to the Lease to be assigned to the Purchaser. The Equipment Company and DPF, however, remain obligated to satisfy the DPF and Lending Bank indetedness [sic], respectively, and will, in effect, apply the benefits of the User and DPF Leases toward such satisfaction. (f) The Seller is now offering to sell all unsold Equipment, subject to a Lease, the DPF and User Leases and the DPF, Lending Bank and Equipment Company Liens, the cash and Notes of *371 Purchasers. (g) Rent due each Purchaser under the Lease with respect to his Equipment will be sufficient to pay installments of the Note, as and when due, and to provide cash flow in excess thereof. Likewise, sums to be received by the Seller from Purchasers upon payment of their Notes and by the Equipment Company from the Seller will be sufficient for the Seller and the Equipment Company to pay the respective installments due the Equipment Company and DPF under their non-recourse installment notes. Thus, while the User will be the principal source of funds to satisfy the Lending Bank indebtedness and DPF will be the principal source of funds to satisfy the DPF indebtedness, the Equipment Company (as lessee under the Lease) will be the principal source of funds to pay the Note of the Purchaser and any cash flow during the term of his Lease. (h) Assuming all parties meet their obligations as scheduled, the Purchaser will own the Equipment upon the expiration of the Lease, without encumbrance, and, at that time, the Equipment Company will undertake to lease, release or sell the Equipment to users for the benefit of the Purchaser for the remarketing fee provided for in its Remarketing *372 Agreement. The investment memo contains the following statement with respect to the residual value of the equipment:
Residual Value
Notwithstanding the present pre-eminence of IBM in the data processing field and the utilization of the Equipment by the User, technological development in the field could greatly affect the future market for, and the residual value of, the Equipment. Historically, the value of computer equipment has tended to relate substantially to the rate of introduction by IBM of new "generations" of computers. To date, IBM has introduced several generations of computers, in intervals of six to nine years, and there can be no assurance that the market, if any, for the systems now in use will [sic] imposed by them or the Federal government as a consequence of anti-trust litigation, improvement of existing technology and the development of new technology, all could substantially affect the entire data processing industry and the value of the Equipment. In short, any appraisal of the Equipment is frought with uncertainty and, therefore, no assurance can be given that the Equipment will have any specified residual value or any value whatsoever after *373 its purchase. Accordingly, in seeking to assess the residual value of the Equipment, whether through the remarketing arrangements with the Equipment Company or otherwise, Purchasers will have to rely on their own independent [sic] appraisals, as Seller makes no representation to prospective Purchasers with respect thereto. In this connection, however, it should be noted that the Seller has obtained, from an independent third party, Equipment appraisals reflecting residual values. Although such appraisals are available for inspection at the offices of the Seller, because they are subject to interpretation, the Seller cautions prospective Purchasers that they should, as suggested above, not be relied upon and Purchasers should seek their own independent appraisals. Petitioner did not seek out any independent appraisal of the specific value of the DAT box to determine whether his purchase price was approximately equivalent to its fair market value or what, if any, residual value he could reasonably expect the equipment to have at the end of this lease 10 years later. By document dated December 10, 1980, captioned "Bill of Sale" CELC sold the DAT box equipment to petitioner. *374 The DAT box was a part of equipment which was leased to ITT by DPF in December 1980 under a lease dated October 9, 1975, extending for a minimum of 48 months following installation at a monthly rental of $ 18,545. Petitioner's DAT box was acquired subject to this lease. The 370/155 CPU with petitioner's DAT remained on rent with ITT until August 20, 1982, the end of the firm lease term. From August 21, 1982 through October 1, 1983, the equipment was warehoused. Beginning on October 1, 1983 the equipment which had been leased to ITT was leased by Criton Leasing Company at $ 7.71 per month for a lease term of 70 months. Pursuant to the "Closing Summary" and "Limited Recourse Promissory Note -- Security Agreement" petitioner was to make payments towards the purchase of the DAT as follows: The purchase price was $ 174,853, payable in three cash installments of: (i) $ 8,306 paid on closing; (ii) $ 14,425 due on January 2, 1981; (iii) $ 9,617 due on January 2, 1982; and the balance of $ 142,505 by limited recourse promissory note (the "Note"). [T]his Note shall be payable in 120 ** consecutive monthly installments as follows: (i) the first 24 payments (i.e., through *375 December 1982) shall be $ 2,185.08, each representing payment only of interest at the rate of 18.4% per annum; and (ii) the next 96 consecutive monthly installments shall be $ 2,181.19, each representing payment of principal and interest at the rate of 12.5% per annum. *376 Computer Equipment Investors, Inc., as lessee, is obligated to make lease rental payments aggregating $ 265,089.12 through December 1990. Under an amortization schedule referred to by the closing summary of the transaction, the note would be paid down to a principal amount of under $ 100,000 in 1988. Petitioner received statements reflecting interest paid, note payments and petitioner's net cash differential showing the following: 1/1/81-
7/1/81-
4/1/82-
1/1/83-
1/1/84-
Payments
6/30/81
3/30/82
12/31/82
12/31/83
12/31/84
Rentals
$ 2,193.18/mo
$ 2,198.18
$ 2,198.18
$ 2,201.60
$ 2,201.60
Note Payments
2,185.08/mo
2,195.088
2,185.98
2,181.19
2,181.19
Net Cash
Differential     13.10/mo     13.10     13.10     20.41     20.41
$    78.60   $   117.90
$   117.900
$   244.92
$   244.92
The "equipment" was appraised for CELC by John R. Wilkins (Mr. Wilkins), president of Communigraphics, Inc. as of June 1980. Mr. Wilkins appraised the following equipment showing the "List Price" indicated: ITT WORLD COMMUNICATIONS INC.
Equipment Manufactured by IBM Corporation
Qty
Unit
Model
Feature
Description
List Price
1
3155
12
Central Proc.
$ 1,070,400
1433
3rd Block MPX Chan
15,710
1434
4th Block MPX Chan
14,620
1435
5th Block MPX Chan
7,355
3700
Ext. Prec. Flt. Pt.
10,090
3950
1401/1410/7010 Compat.
19,200
7855
3215 Adapter
11,450
S20479
Dynamic Addr. Trans.
224,900
1
AMS 33159
2 Meg. PSU Memory
100,000
1
3215
Console
9,435
1
3830 2
Storage Control
47,580
2150
Control Stor. Ext.
11,000
611
Register Expansion
640
$ 1,542,380
*377 Mr. Wilkins determined that the total equipment had a value of $ 1,122,255 but made no piece by piece appraisal. In his appraisal Mr. Wilkins stated: The IBM 3155 is at present one of IBM's latest models in its price and capacity range. The IBM controller is the latest model of its specific type. Both should have an economic life of not less than twelve years. Below are the anticipated residual values for the equipment described in Exhibit A upon the expiration of the initial user lease term and upon the expiration of 120 months: August, 1982
--
$ 870,045
June, 1990
--
224,500
The user lease is for 26 months at a rental of $ 18,545 per month. Using the existing debt interest rate of 10.75% per annum, the present value of the user lease is $ 432,271. In our opinion, the assessed value of the equipment described in Exhibit A should be the sum of the present value of the user lease plus the present value of the residual value of such equipment upon expiration of the initial user lease term. We have discounted such residual value at 10.75% and calculated the appraised value as follows: Present value, user lease:
$ 432,271
Present value, residual:
689,984
Appraised value:
$ 1,122,255
*378 The "Rental Schedule" for petitioner's DAT projected annual cash flow as follows: RENTAL SCHEDULE
Monthly
Monthly Note
Annual Cash
Rental
Payment
Flow
1980
$ 2,185.08
$ 2,185.08
-0-
1981
2,198.18
2,185.088
$ 157.20
1982
2,198.18
2,185.08
157.20
1983
2,201.60
2,181.19
244.92
1984
2,201.60
2,181.19
244.92
1985
2,207.43
2,181.19
314.88
1986
2,207.43
2,181.19
314.88
1987
2,216.17
2,181.19
419.76
1988
2,216.17
2,181.19
419.76
1989
2,222.00
2,181.19
489.72
1990
2,222.00
2,181.19
489.72
Total cash flow, including all income and disbursement, through December 31, 1990 was fixed by the terms of the transaction in 1980. The total receipts by petitioner under the lease assignment is the sum of its rental receipts. Referring to the "Rental Schedule," the total amounts to be received as rental payments over the 10-year period are as follows: AMOUNT TIMES
NUMBER OF PAYMENTS
TOTAL
431.03 X 1 =
$    431.03
2,198.18 X 24 =
52,756.32
2,201.60 X 24 =
52,838.40
2,207.43 X 24 =
52,978.32
2,216.17 X 24 =
53,188.08
2,222.00 X 24 =
53,328.00
Total amount to be
$ 265,520.15
received in ten years
*379 Total cash outflow paid by petitioner is the sum of all payments, principal and interest on the three notes financing the purchase price plus his cash downpayment. The total of petitioner's disbursements is: Cash downpayment
$   8,306.00
Note A due January 2, 1981:
Principal
$  14,425.00
Interest
45.00
14,470.00
Note B due January 2, 1982:
Principal
$   9,617.00
10,845.00
Interest    1,228.00
10,845.00
Note C
$ 431.03 X 1
$     431.03
$ 2,185.08 X 24
52,441.92
$ 2,181.19 X 96  209,394.24  262,267.19
Total disbursements
$ 295.888.19
Petitioner made only a cursory review of the investment memoranda he received in July or August 1980. In October petitioner forwarded the materials to his accountant and his attorney for their review. Petitioner's accountant told him he would receive a return of approximately a 10 percent per year on his investment plus residual value at the end of the lease term. However, the accountant made no calculations with respect to the investment's break-even point. Petitioner's *380 tax attorney informed him he would receive tax advantages for a period of 4 years followed by income for 6 years. In 1980 neither petitioner, his accountant, nor his tax attorney, knew what a DAT box was. Petitioner did not know when the DAT was first announced and installed by IBM or if IBM was still manufacturing or selling the DAT in late 1980. Petitioner did not check the serial number to be certain whether he was purchasing the equipment that he thought he was buying. Petitioner did not attempt to negotiate a better price for his purchase. Petitioner was unaware that there were a number of persons dealing in the used computer market who could have provided appraisals of his equipment's value. Petitioner also was unaware that there existed a computer industry blue book. Petitioner did not check Mr. Wilkins' credentials as an appraiser or seek out any other appraiser. Petitioner did not inquire into the industry guide lines for leasing a computer of the 370/155 series. Petitioner was unaware he was purchasing the equipment for more than its list price. Petitioner did not inquire about the seller's profit on his purchase of the equipment. Petitioner did not know who *381 CEI, DPF, Communigraphics or Criton Computer Leasing were. Petitioner did not know where his equipment was located or how much the end-user was paying for its rent. At the time of purchase petitioner believed he was buying a percentage interest in both the computer and the DAT which were listed on the equipment list. The IBM series 370 was first announced in 1970 and the Model 155 ("155"), which was used by medium to large operations, came on the market in 1971. In 1973 IBM brought out Models 158 and 168. These computers were put on the market before the announced date. To placate 155 purchasers the DAT produced to give a 155 virtual memory and speed thereby making its use economically viable. The DAT could be used only with Model 155 mode computers. By December of 1980 the Model 155 was not state of the art. While IBM was manufacturing DATs, a purchaser could order a 155 with a DAT. After 1975 IBM no longer produced any DATs and after 1978 IBM no longer marketed DATS. The IBM consultant's manual dated June 1980 indicates that 155s were no longer available. The E series or 4300 series of IBM computers was announced and introduced by IBM in 1979 prior to Mr. Wilkins' *382 appraisal of the equipment which included petitioner's DAT. The E series was the most revolutionary computer system introduced by IBM up to the time of its introduction. The E series was competitive with the 370/155. The 4341 had relative performance to the 155 at approximately 1/10th the operational cost and 1/5th the maintenance cost. Petitioner on his Federal income tax return for 1980 claimed an interest deduction of $ 431, a depreciation deduction of $ 24,823 and a leasehold acquisition cost of $ 78 with respect to the computer equipment. The total of the above less $ 431 reported as rental received or $ 24,901 was claimed as a loss deduction. For the calendar year 1981, petitioner reported rents received from the computer equipment of $ 26,378 and claimed deductions of $ 26,221 for interest, $ 921 for leasehold acquisition and $ 42,198 for depreciation with respect to the computer equipment making total deductions of $ 69,340 and resulting in a claimed loss from the transaction of $ 42,962. Respondent in his notice of deficiency disallowed petitioner's claimed losses from his computer leasing activity for the years 1980 and 1981. OPINION Respondent takes the position *383 that petitioner's transactions with respect to the computer equipment was not a valid business transaction but was entered into solely for the purpose of tax avoidance and that therefore petitioner is not entitled to the claimed loss deductions from this activity. In Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 195 (1983), affd. in part, revd. in part 752 F.2d 89 (4th Cir. 1985), we stated: It is well established that a transaction entered into solely for the purpose of tax reduction and which has no economic or commercial objective to support it is a sham and without effect for Federal income tax purposes. [Citations omitted.] Petitioner contends that he invested in the computer equipment with a business purpose -- an objective to make a profit, and therefore is entitled to depreciation deductions on the equipment under section 167 and to the other claimed deductions. In Rice's Toyota World, Inc. Commissioner, supra, we interpreted Frank Lyon Co. v. United States,435 U.S. 561 (1978), to conclude that a transaction would be recognized for tax purposes if the taxpayer was motivated by a business purpose other than *384 merely obtaining tax benefits or the transaction had economic substance in that there was a reasonable possibility of economic profit. See Packard Commissioner,85 T.C. 397 (1985). In keeping with Frank Lyon and Rice's Toyota World respondent specifically argues that petitioner's purchase-leaseback transaction is devoid both of business purpose, petitioner lacking a profit motive for his transaction, and economic substance, there being no reasonable possibility of profit apart from tax benefits. "The business purpose inquiry simply concerns the motives of the taxpayer in entering the transaction." Rice's Toyota World, Inc. Commissioner, 752 F.2d at 92. Petitioner testified that he entered into the computer equipment transaction for the purpose of making a profit. However, the objective facts rather than petitioner's self serving statements are controlling. The facts here show that petitioner failed to examine the transaction from an economic standpoint. Petitioner had limited computer experience (the purchase of billing equipment), but no computer expertise at the time he entered into the transaction here in issue. He did not subsequently *385 acquire any such expertise. Petitioner instead relied upon the advice of his financial adviser, attorney and accountant, none of whom had any computer expertise. None of petitioner's advisers even knew what a DAT box was. Petitioner had neither his attorney nor his accountant determine the economic break-even point for the investment. Both of these persons advised him regarding the tax advantages in the early years but did inform him that some income would be generated in the later years. Petitioner was unaware of exactly what he was purchasing. He did not understand that he was purchasing the DAT box itself rather than a percentage in the entire computer system shown on the equipment list. Petitioner did not know where his equipment was located, that he was purchasing the equipment for greater than its list price (even though this was set forth on the purchase documents themselves), whether IBM still manufactured the series 155 and/or the DAT box, or when the series 155 and the DAT were first introduced and delivered. Petitioner failed to negotiate for a better selling price, and failed to, as was recommended in the investment memo, acquire or obtain an additional appraisal *386 for the equipment or a second opinion from anyone qualified to determine its residual value. Neither his investment adviser, nor the attorney nor accountant had any expertise in the computer field and none of these persons was called by petitioner as witnesses at the trial. Petitioner when he entered into the transaction had no idea whether the equipment he was purchasing was then or was soon to be considered obsolete in the used computer market. Petitioner's argument that his previous profitable computer experience led him to believe the transaction here at issue would be a profitable venture is without merit. To the contrary, it would appear that petitioner, who so carefully sought out the advice of a known computer expert to evaluate the prior transaction, would likewise have obtained such advice before entering this individual venture. Petitioner contends that the fact that he paid $ 32,340 in cash in the early years of the transaction demonstrates his commitment to the investment. In the two years here in issue, however, the investment produced a claimed loss in the amount of $ 67,863 which if sustained could have created a tax saving in excess of his cash payment. Petitioner *387 was apparently anticipating similar tax savings for several years. If petitioner had considered the transaction from a profit motive standpoint aside from the tax savings it seems logical that he would have consulted a qualified expert with respect to the residual value of the equipment he was acquiring. Petitioner argues that his previous experience had led him to believe computer equipment did not rapidly become obsolete but rather had a long economic useful life. His unwillingness to renew leasing the billing equipment for the corporation at the same price as a prior 5-year lease exhibits a contrary conclusion on petitioner's part. It is unlikely that a physician in petitioner's field, radiology, would seriously believe that technological advancement would not cause equipment, particularly equipment which was already approximately 9 years old, to become obsolete over a 10-year lease term. We conclude that petitioner's claim that he believed that this transaction would be profitable was completely self-serving and we decline to accept petitioner's self-serving statements regarding his profit motive. Surloff Commissioner,81 T.C. 210, 239 (1983). In spite *388 of petitioner's protestations to the contrary, we conclude from the record that petitioner had no business purpose in entering into the computer equipment transaction. Even though petitioner has failed to establish a business purpose for his computer equipment transaction, this transaction could be recognized for tax purposes if it had economic substance. Frank Lyon Co. v. United States, supra; Rice's Toyota World, Inc. Commissioner, supra.
If an objective analysis of the investment indicates a realistic opportunity for economic profit which would justify the form of the transaction, it will not be classified as a sham. In order to make this determination, we must probe beneath the labels given by the parties and view the transaction in the context of its surrounding facts and circumstances. [Rice's Toyota World, Inc. Commissioner,81 T.C. at 203. Fn. ref. omitted.] Petitioner argues his transaction had economic substance because at the time he entered into the transaction there was a reasonable possibility of profit. Respondent contends the transaction had no reasonable possibility of profit at the time it was entered into and thus lacks *389 economic substance. We have found as a fact, that without considering residual value, petitioner's transaction would require a total outlay of $ 295,888.19 with a concurrent right to receive a total of $ 265,520.15 producing a $ 30,368.04 loss. Thus unless the residual value of the equipment at the end of the 10-year lease was greater than the $ 30,368.04 amount there would be no possibility of economic profit. Two expert witnesses testified at trial with respect to the equipment's value. Petitioner's witness, John Wilkins, president of Communigraphics, Inc., prepared the appraisal for the entire equipment on the "Equipment List" for CEI and CELC. Mr. Wilkins concluded the equipment had a value in June 1980 of $ 1,122,255 based on a present value for the 26-month user lease of $ 432,271 and the present value for the residual value of $ 689,984 (based on an August 1982 estimate of residual value of $ 870,045). Mr. Wilkins' June 1980 appraisal did not break down the appraisal with respect to the various components of equipment described and specifically provided no estimate of value for petitioner's DAT box. Mr. Wilkins failed to produce any worksheet or documents to support *390 his calculations relying instead on his experiences in the used computer market. In addition, he provided no explanation of the methodology from which he derived the above-mentioned figures. Mr. Wilkins testified that he became involved in computer appraising in 1979 providing approximately 6 appraisals that year, followed by 12 in 1980 and from then on doing some 75 to 100 per year. However, he produced no other appraisals which would tend to sup-port the position he took in this case. Mr. Wilkins testified that the series 370 was announced by IBM in 1970 with the 155 coming onto the market in 1971. Some two years later the Models 158 and 168 followed which necessitated the production by IBM of the DAT box in order to placate the 155 buyers. The DAT allowed the 155's to remain economically viable. Ordinarily IBM had introduced a new model series of computers every four or five years. Newer series offered increased cost efficiency causing older models which did not become physically obsolete to become economically obsolete. By the time of Mr. Wilkins' June 1980 appraisal it was some 10 years since the 370 series had been announced. The 158 and 168 models had followed shortly *391 after the 155. The 303X series delivered in 1978 had come onto the market with even further cost efficiency and IBM had announced its most innovative series to date the 4300 series, albeit earlier than would have been expected, some one or two years prior to 1980. Mr. Wilkins however testified that the extreme economic conditions of the time, high interest rates and inflation, caused the older computers to retain a high percentage of their initial value because likely purchasers were concerned with a cost savings. Mr. Wilkins stated that on two occasions in 1979 and 1980 (prior to the June 1980 Cambridge appraisal and thus at least six months before petitioner's investment) he tried to locate DATs for purchase for over $ 200,000 but could not find any available. From this he concluded that their value was some $ 175,000 to $ 200,000 at the time, based in part on the rental stream to be generated. Mr. Wilkins further testified that during the period 1979 through 1980 the 155 with DAT was not obsolete but also was not state of the art. This is contrary to his statement on the appraisal he did for CEI which states "the IBM 3155 is at present one of IBM's latest models in its price *392 and capacity range." That is the same document which in the "Industry Background" section describes the IBM computer series' development but fails to mention the 1979 announcement of the 4300 series. Mr. Wilkins admitted that at the time of trial the DAT value had fallen to zero, but explained that in November 1980 (although his appraisal was made in June) the value decline for DATs could not be foreseen because one could not foresee economic change. By June 1980 the introduction of subsequent IBM models up through the 4300 series was not a matter of foresight but hindsight and the effect of the introduction of these new models on the residual value of a then 10-year old computer could have been estimated. Such an estimate could have been based in part on an awareness of when IBM stopped manufacturing the DAT or the 155, a fact of which Mr. Wilkins was unaware. Further, Mr. Wilkins stated in his November 18, 1985 report that "in 1980, according to dealers and brokers active in the large mainframe market, the DAT was trading at $ 175,000 to $ 200,000." Mr. Wilkins however provided no specific examples of this fact. Mr. Wilkins relied primarily on his attempts to find an available *393 DAT on the market in early 1980. However, he also stated that a person could put whatever price he wanted on equipment if he could not find it. This is exactly what we believe Mr. Wilkins did. Mr. Wilkins testified he did not agree with blue book estimates of price because he questioned the objectivity of the blue book. He said he did not contact Steven Hardman when looking for a DAT because Hardman did not deal in mainframes (a fact controverted by respondent's expert) even though the January 1981 Blue Book compiled by Hardman advertised a 155 with DAT for $ 25,000. While Mr. Wilkins would ascribe at least one-half of the cost of a DATed 155 to the DAT itself, he had no personal knowledge whether the DATed 155 market dropped demonstrably between June and December of 1980. Respondent's expert Dee Morgan relied on documentary evidence available at the time of Mr. Wilkins' appraisal. She valued a DATed 155 at approximately $ 25,000 in December 1980 based on advertisements in various computer industry sources. She controverted Mr. Wilkins' statement that the 4300 series was not competitive with the series 370/155 with DAT. Ms. Morgan stated that the 155 was not state of the *394 art in 1980 but rather was obsolete. She testified that after 1975 IBM no longer produced, and after 1978, no longer marketed 155s, and that according to the June 1980 IBM Consultant's Manual, the 155 was no longer available. While Ms. Morgan was unable to identify specific prices at which Dated 155s sold between May and June 1980, a Lords Computer Leasing document dated October 13, 1980 listed a DATed 155 for $ 45,000. Ms. Morgan was valuing a DATed 155 which was for sale. We accept her value of from $ 25,000 to $ 45,000 for a DATed 155 computer in December 1980. Mr. Wilkins was valuing a DATed 155 which at the time, June 1980, was subject to a 26-month lease to ITT. That lease guaranteed a monthly rental of $ 18,000, some $ 220,000 yearly. Thus Mr. Wilkins included a present value for that guaranteed rental stream in valuing the computer which was the subject of the lease. However his methodology, or lack thereof in explaining his residual value estimate is subject to criticism. We accept the present value of $ 432,271 for the user lease for the entire equipment. By dividing petitioner's claimed value of $ 174,853 for the DAT by the total claimed value of $ 1,122,255 and *395 multiplying that by the $ 432,271 value, the value of the DAT Box based on the value of the lease would be $ 67,349.983. However, the ITT lease was not petitioner's lease. Therefore the lease value of the equipment including the DAT was a value to the lessor to ITT but not to the petitioner. Petitioner was to receive only the monthly payments called for in his agreement with Cambridge. The value of the ITT lease did not add to the value of the equipment petitioner acquired. Other than Mr. Wilkins' valuation of the ITT lease, he and Ms. Morgan were valuing the same thing, the present value of a 9 or 10-year old piece of computer equipment and the residual value in 1990 of a then 20-year old item of computer equipment. Finding no historical precedent for a 20-year old useful life for computer equipment and in light of the degree of technological advancement both to the time of Mr. Wilkins' appraisal in June 1980 and reasonably projecting ahead for 10 additional years we conclude that the residual value of the equipment in 1990 would be expected in December 1980 to be zero. Thus we accept respondent's expert's conclusions as to a residual value of zero. Accordingly, because there *396 is no residual value to the equipment, petitioner cannot recover the $ 30,368.04 ordinary loss the transaction would produce and thus there is no reasonable possibility of economic profit from the computer equipment transaction. Compare James v. Commissioner,87 T.C. 905 (1986), with Mukerji v. Commissioner,87 T.C. 926 (1986). We conclude that petitioner had no business purpose for entering the computer equipment transaction but entered into the transaction solely for tax avoidance. We further conclude that the transaction had no reasonable possibility of economic profit. For these reasons petitioner's computer equipment transaction is disregarded for Federal income tax purposes. Since petitioner's computer leasing transaction lacked substance other than as a tax avoidance scheme, petitioner is not entitled to the depreciation and miscellaneous deductions claimed. Rice's Toyota World, Inc. v. Commissioner, supra.Depreciation is allowable only on property used in a trade or business or held for the production of income. An activity or transaction engaged in solely for tax avoidance is not a trade or business or an activity engaged in for *397 the production of income. Beck v. Commissioner,85 T.C. 557, 569-570 (1985). Petitioner claims he is entitled to interest deductions on the recourse and nonrecourse liabilities incurred in purchasing the equipment. Respondent claims no interest expense deduction is allowable because there is no bona fide indebtedness in that there is no economic substance to petitioner's transaction. In Rice's Toyota World, Inc. v. Commissioner, supra, this Court disallowed as a matter of law the interest deduction relating to both the recourse and nonrecourse portions of the debt. The Fourth Circuit however reversed this Court on the disallowance of the interest on the recourse note. The Fourth Circuit noted it did not follow from a sham determination that the interest paid or accrued on recourse indebtedness was not deductible. It relied on Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981), as support for the proposition "that a sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded." Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96. *398 The Fourth Circuit concluded that section 163 did not limit deductibility of installment interest expense "depending on the item purchased by the taxpayer." In Rose v. Commissioner,88 T.C. 386, 423 (1987), we accepted the Fourth Circuit's distinction between the allowability of interest deductions for recourse as opposed to nonrecourse debt. In both Rice's Toyota World and Rose, the interest was the actual interest paid in cash on the downpayment made by the taxpayer. The comparable amount in the instant case would be zero in the year 1980 and $ 45 in the year 1981. Petitioner in the instant case argues that under the holding in Rice's Toyota World he is entitled to deduct the interest with respect to the $ 100,000 recourse portion of the note which was to be paid off by the amounts referred to as rental payments. It is not clear that Rice's Toyota World and Rose would be applicable to a note which is to be paid by the so called rental payments of a transaction which lacks business purpose and economic substance. However, it is to be noted that in this case, respondent merely disallowed the net losses claimed by petitioner on the computer *399 equipment transaction. In 1981 this amount is less than the amount of depreciation and miscellaneous deductions claimed. Therefore the $ 45 interest on the down payment note has effectively been allowed by being offset by the $ 157 cash flow in 1981 and interest on the recourse portion of the partially recourse note has allowed effectively by being offset by the so called rental payments included by petitioner in his income. Therefore, there is no real issue in this case with respect to the deduction of interest on these notes. In our view the issue of allowance of interest deductions on recourse notes in this case differs from the issue decided by the Circuit Court in Rice's Toyota World and this Court in Rose. In effect an allowance of interest deductions in this case has been made by respondent by his disallowance of only the claimed net losses. By amendments to answer respondent raised the issues of the increased interest rate under section 6621(c), the addition to tax for a substantial valuation overstatement under section 6659 and claimed $ 5,000 damages under section 6673. Section 6621(c)[3] imposes interest at the rate of 120 percent of the statutory rate on *400 substantial underpayments of tax attributable to tax-motivated transactions. Section 6659 imposes an addition to tax equal to the applicable percentage of the underpayment attributable to a valuation overstatement. Valuation overstatements are defined by section 6659(c) as follows: (c) Valuation Overstatement Defined. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). [Emphasis supplied.] *401 Subsection 6621(c)(3)(A)(i) includes within the term tax-motivated transaction, valuation overstatements within the meaning of section 6659(c). We have concluded that petitioner's equipment transaction was without business purpose or economic substance and was to be disregarded for Federal tax purposes. Petitioner claimed a basis of $ 174,853 in his equipment. In fact he acquired no basis in that equipment for depreciation purposes. Thus the claimed adjusted basis constitutes a valuation overstatement within section 6659(c) and because it exceeds 250 percent of the actual value the applicable percentage under section 6659(b) is 30 percent. Rose v. Commissioner, supra.Accordingly, the portion of the underpayment attributable to disallowed depreciation is attributable to a valuation overstatement and therefore subject to the 30-percent addition and likewise subject to the increased interest rate of section 6621(c). The increased interest rate applies to interest accruing after December 31, 1984, even though the transaction was entered prior to the date of enactment of section 6621. Solowiejczyk v. Commissioner,85 T.C. 52 (1985), affd. *402 without published opinion 795 F.2d 100; (2d Cir. 1986). We have found the amount of depreciation claimed in each of the years here of issue and the portion of the underpayment due to these claimed deductions is subject to the increased interest under sections 6621(c) for 1980 and 1981 and the addition to tax under section 6659 for 1981. Because respondent disallowed only the net loss claimed by petitioner in [Illegible Word] year, he has effectively allowed the claimed interest [Illegible Word] except to a small extent. Certainly the [Illegible Word] of these deductions which were not offset by (Illegible Words] and the miscellaneous deductions were tax [Illegible Words] transactions. We have held the entire computer [Illegible Words] to be entered into for tax avoidance and [Illegible Words] a tax motivated transaction. Patin v. Commissioner, [Illegible Words] No. 62 (April 29, 1987). Finally [Illegible Word] contends petitioner brought a frivolous [Illegible Words] the Tax Court and has maintained that position [Illegible Words]. Respondent asserts that we should determine [Illegible Words] petitioner under section 6673. [4]
*403 While we have concluded that the transaction is to be disregarded for tax purposes, we do not consider that under the circumstances here damages under section 6673 are appropriate. At the time of the trial of this case, the Fourth Circuit had reversed the holding of this Court on the issue of deductibility of interest on certain recourse notes in Rice's Toyota World, Inc. v. Commissioner, supra. While we consider the facts in this case to clearly show that petitioner's computer equipment transaction lacked business purpose and economic substance, we found certain computer leasing transactions involved in other cases to be valid business or investment transactions. In our view this case is not one in which damages under section 6673 should be imposed on petitioner. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Hereinafter petitioner will refer solely to Frederick H. Dobbs. ↩
**. plus interest only from the date hereof through December 31, 1980 at the rate of 18.4% per annum in the amount of $ 431.03. The limited recourse nature of the note was explained as follows: 6.3. Limited Recourse.↩ Anything in this Note to the contrary notwithstanding, Payee agrees to look solely and only to the Collateral for the Payment, performance and observance of all of the obligations of Payor under this Note except for the Recourse Portion, and Payee, for itself and its successors and assigns, hereby expressly waives any rights to enforce payment or performance hereunder, except for the Recourse Portion, by Payor, its subsidiaries or shareholders, or its or their shareholders, directors, officers, agents, employees or partners, or to recover damages for any breach of warranty, covenant, or agreement of Payor hereunder, except for the Recourse Portion, other than to proceed against the Collateral. As used herein, the term "Recourse Portion" shall mean the first $ 100,000 of the principal amount to be paid upon this Note. 3. Section 6621(c) provides as follows: (c) Interest on Substantial Underpayments Attributable to Tax Motivated Transactions. -- (1) In general. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) Substantial underpayment attributable to tax motivated transactions. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) Tax motivated transaction. -- (A) In general. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092), (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction. (B) Regulatory Authority. -- The Secretary may be regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may be regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account -- (i) the ratio of tax benefits to cash invested, (ii) the methods of promoting the use of this type of transaction, and (iii) other relevant considerations. (C) Effective date for regulations. -- Any regulations prescribed under subparagraph (A) (iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed. (4) Jurisdiction of Tax Court. -- In the case of any proceeding in the Tax Court for a redetermination of a deficiency, the Tax Court shall also have jurisdiction to determine the portion (if any) of such deficiency which is substantial underpayment attributable to tax motivated transactions.↩
4. Section [Illegible Words] as follows: SEC. 6673. DAMAGES ASSESSABLE FOR INSTITUTING PROCEEDINGS BEFORE THE TAX COURT PRIMARILY FOR DELAY, ETC. Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $ 5,000 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax. ↩